1  HANNA Q. RHEE, MD
   1887 Whitney Mesa Dr., Ste. 1919
2  Henderson, NV 89014
   black.patients.matter@gmail.com
3

4  In Propria Persona

5

**FILED**

MAR 09 2023

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY_____
          DEPUTY CLERK

6            IN THE UNITED STATES DISTRICT COURT

7          FOR THE EASTERN DISTRICT OF CALIFORNIA

8

9  HANNA Q. RHEE, MD;
10            Plaintiff,

11       vs.

12  MEDICAL BOARD OF CALIFORNIA,  XAVIER BECERRA,     )  2: 2 3 - CV - 0 4 3 8 KJM DB PS
13  KIMBERLY KIRCHMEYER, ALEXANDRA M. ALVAREZ,        )
    CALIFORNIA OFFICE OF ADMINISTRATIVE HEARINGS,      )
14  TIFFANY KING,ANTHONY CORELLA, KRISTINA LAWSON,)  No.
    MITCHELL BECKLOFF, JODI TILL, GAVIN NEWSOM,        )
15  STATE OF CALIFORNIA, HAWAI'I DEPARTMENT OF          )
    COMMERCE AND CONSUMER AFFAIRS, DESIREE L.           )
16  HIKIDA, JONE GEIMER-FLANDERS, JOHN T. HASSLER,     )
    COMMONWEALTH OF VIRGINIA DEPARTMENT OF              )
17  HEALTH PROFESSIONALS, ROB BONTA, FEDERATION OF )
    STATE MEDICAL BOARDS, MEGAN O'CARROLL,              )
18  CALIFORNIA DEPARTMENT OF CONSUMER AFFAIRS,          )
    NATHAN E. LAVID MD, REINHARDT HILZINGER MD,         )
19  AMERICAN PSYCHIATRIC ASSOCIATION,                   )  DEMAND FOR
20  DOE'S 1-10;                                         )  JURY TRIAL
              Defendants.                               )
21  _____ )  TRIAL DATE:  TBA

22

23  Plaintiff, Hanna Q. RHEE MD, complains of Defendants and each of them as follows:

24

25              I. JURISDICTION AND VENUE

26      Plaintiff brings this civil rights lawsuit pursuant to 42 USC § 1981 to redress the

27  deprivation by Defendants, under color of state law, of rights secured to the Plaintiff under the

28  United States ("US") Constitution, including the Fourth, Fifth, Eighth, and Fourteenth

                                    1

1  Amendments of the US Constitution and under federal law.

2     Jurisdiction is conferred on this Court by 28 USC § 1343(3) and 1343(4), which provide

3  the original jurisdiction in this Court of all suits brought pursuant to 42 USC § 1981. Jurisdiction

4  is also conferred by 28 USC § 1331 insofar as the claims for relief derive from the US

5  Constitution and the laws of the US.

6     By virtue of 28 USC § 1367 this Court has supplemental jurisdiction over ancillary

7  claims brought pursuant to State law.

8     Venue is properly conferred on this Court pursuant to 14 USC § 15 and 28 USC §

9  1391(b) because the Defendants are subject to personal jurisdiction in the District and because a

10 substantial part of the events giving rise to the claim alleged herein took place in this District.

11

12                              II. PARTIES

13     At all relevant times herein, Plaintiff HANNA Q. RHEE MD, is a US citizen who was

14 domiciled in the State of California ("SOC"). She was a licensed physician in SOC, Virginia

15 ("VA"), and Hawai'i ("HI").

16     1.     Defendant Xavier Becerra trained attorney was the Attorney General for SOC at

17 the time in which the events mentioned in this Complaint occurred. He is currently US President

18 Biden appointed US Secretary of Health & Human Services despite no experience in healthcare.

19 The Defendant is sued in his individual and official capacities.

20     2.     Defendant Kimberly Kirchmeyer was the Executive Director of MBOC during the

21 time in which the events of this Complaint occurred. She has been promoted by Defendant

22 Newsom to Director of California Department of Consumer Affairs ("CaDCA"). She is being

23 sued in both Director positions, as well as in her individual and official capacities.

24     3.     Defendant Alexandra M. Alvarez is a Supervising Deputy Attorney General for

25 SOC. Defendant is sued in her individual and official capacities.

26 4.    Defendant California Office of Administrative Hearings ("CaOAH") is a SOC office for

27 resolution of administrative matters. Defendant is sued in its official capacity.

28                                    2

5.    Defendant Tiffany King is an Administrative Law Judge trained attorney employed by CaOAH. Defendant is sued in her individual and official capacity.

6.    Defendant Anthony Corella is employed by SOC and works at CaOAH as the Administrator charged with overseeing official hearing transcript requests from the public. Defendant is sued in both his individual and official capacity.

7.    Defendant Medical Board of California ("MBOC") is the SOC medical licensing entity which oversees the proper licensing and regulation of physicians and other allied health care professionals.  Defendant is sued in its official capacity.

8.    Defendant Kristina Lawson is a trained attorney and current President of MBOC. Defendant is sued in her individual and official capacity.

9.    Defendant Mitchell Beckloff is a trained attorney and employed by SOC as Judge in the Circuit Court. Defendant is sued in his individual and official capacity.

10.    Defendant Jodi Till is employed by SOC as a SOC-certified court transcriptionist in CaOAH.  Defendant is sued in her official capacity.

11.    Defendant Gavin Newsom is the Governor of SOC.  Defendant is sued in his individual and official capacities.

12.    Defendant SOC is a state in the US which receives federal funding related to the American Disabilites Act of 1990 ("ADA").  Events listed in this complaint occurred in SOC. Defendant is sued in its official capacity.

13.    Defendant Hawai'i Department of Commerce and Consumer Affairs ("HiDCCA") is a consumer protection entity in the state of Hawai'i ("SOH") and receives federal funding related to ADA.  Defendant is sued in its official capacity.

14.    Defendant Desiree L. Hikida is employed by SOH as an Administrative Hearings Officer in HiDCCA SOH. Defendant is sued in her individual and official capacities.

15.    Defendant Jone Geimer-Flanders ("Flanders") is a physician member of the Hawai'i Medical Board.  Defendant is sued in her individual and official capacities.

16.    Defendant John T. Hassler is employed by SOH as an attorney representing HiDCCA. Defendant is sued in his individual and official capacities.

3

1    17.    Defendant Commonwealth of Virginia Department of Health Professionals

2  ("CViDHP") is a federally funded entity in the Commonwealth of Virginia ("COV").  Defendant

3  is sued in its official capacity.

4    18.    Defendant Federation of State Medical Boards ("FSMB") is a private corporation

5  which receives federal funding and is heavily involved in nearly every aspect of a physician's

6  education, credentialing, licensing career and coordinates related policies nationwide in close

7  relationship with SOC, COV, SOH.  Defendant is sued in its official capacity.

8    19.    Defendant Megan O'Carroll is a Deputy Attorney General for SOC ("CaDAG").

9  Defendant is sued in her individual and official capacity.

10    20.    Defendant California Department of Consumer Affairs ("CaDCA") is a federally

11  funded entity of SOC which licenses and regulates state licensed workers in SOC.

12    21.    Defendant American Board of Psychiatry and Neurology, Inc ("ABPN") is a

13  corporation which Board-certifies psychiatrists and maintains a working relationship with SOC,

14  COV, SOH.  ABPN is sued in its official capacity.

15    22.    Defendant Nathan Lavid MD is a Board-certified psychiatrist contracted with

16  MBOC.  Defendant Lavid is sued in his individual and official capacities.

17    23.    Defendant Reinhardt Hilzinger MD is a non-Board certified family medicine

18  physician contracted with MBOC.  Defendant Hilzinger is sued in his individual and official

19  capacities.

20    24.    Defendant Rob Bonta is the current California Attorney General.  He is sued in

21  his individual and official capacities.

22    25.    Doe's 1-10.

23      The true names and capacities, whether individual, corporate, associate, or otherwise,

24  Doe Defendants 1 through 10 are known to Plaintiff who therefore sues said Defendants by such

25  fictitious names.  Plaintiff is informed and believes, and on that basis, alleges, that each of the

26  Defendants designated as Doe Defendants are responsible in some manner for the events and

27  occurrences referenced in this Complaint, and/or may be affiliated with one of the other

28  Defendants or may claim some interest in the subject matter of this complaint.  Plaintiff will ask

4

1   leave of the Court to amend this complaint and insert the true names and capacities of Doe
2   Defendants 1 through 10 when the identities of the same have been ascertained and to join said
3   Defendants in this action.

4       At certain times hereinafter alleged, Defendants, and each of them, were acting as agents
5   and employees of their co-Defendants, are in doing the acts hereinafter alleged, were acting
6   within the course and scope of such agency or employment, with the full knowledge, actual or
7   constructive, permission and consent of their co-Defendants, and each of them, such that legal
8   responsibility for any and all harm caused by such alleged acts is imputed to said Defendants and
9   co-Defendants.

10      At other times hereinafter alleged, Defendants, and each of them, were acting
11  independently and maliciously, outside of the course and scope of their regular agency or
12  employment.

13

14                          III.    STATEMENT OF FACTS

15      Plaintiff had been practicing medicine since obtaining her Hawai'i Medical License in
16  2006, California 2011, and Virginia 2014. Plaintiff has no prior complaints, claims, lawsuits, nor
17  any other issues with her property (i.e. medical license) until she began working at Orchard
18  Hospital ("OH") in Gridley, California ("CA") in March 2015 and became a federal
19  whistleblower.

20      Plaintiff worked at OH from April to September 2015 as an outpatient clinic internist.
21  Plaintiff was the only clinic physician of her race and religion working there. Having been born
22  into her race and raised within her ethnic and religious beliefs, Plaintiff has always acted as such
23  throughout her lifetime having never been described as "odd.. strange.. outside of societal norm"
24  until she was ordered by Defendant Bholat to undergo a psychiatric evaluation with Defendant
25  Lavid due to Bholat's racist bias and retaliation [EXHIBIT A]. Specifically, on or about 2014
26  Plaintiff had performed multiple federally-mandated health assessments on Defendant Bholat's
27  disabled and elderly patients seen at University of California at Los Angeles ("UCLA") Family
28  Medicine Clinic and reported Bholat's deficiencies to the federal clients. Bholat received signed

5

1   copies of Plaintiff's health assessments noting the federal deficiencies, then retaliated against the
2   Plaintiff by ordering the psychiatric exam on the Plaintiff due to her "concerning behavior" so as
3   to discredit Plaintiff and therefore discredit Plaintiff's report to federal agencies.

4   From April to June 2015, Plaintiff worked at OH as a locum tenens. OH then offered her
5   a position to work directly with OH around July 2015, which Plaintiff accepted. By May 2015,
6   Plaintiff was instructed by clinic director Henry Starkes MD (who has since surrendered his
7   medical license due to dishonesty and other fraudulent acts) to illegally prescribe narcotics, and
8   Plaintiff refused. From then on, Plaintiff was harassed and belittled by Starkes along with other
9   hospital employees for *underprescribing* narcotics to patients. OH refused to provide Plaintiff
10  with updated copies of the OH Medical Bylaws and Code of Conduct after disciplining her for
11  such acts then placing Plaintiff on a precautionary suspension. Without knowing next steps as
12  dictated in the Medical Bylaws, Plaintiff resigned and opened a private clinic a few blocks away.
13  Since Plaintiff resigned while being investigated, SOC laws require OH report this to MBOC
14  which was done in September 2015. The latter then opened an investigation on Plaintiff.

15  In November 2015, Plaintiff voluntarily met with MBOC. While there, Plaintiff repeated
16  her testimony regarding the OH "pill mill" to which MBOC Investigator Moya replied, "Hey, if
17  you keep saying that you need to go and report it, or you could be held liable you know."
18  Plaintiff became worried and within a few days met with agents of the Drug Enforcement
19  Agency ("DEA") in Sacramento and filed multiple complaints with the US Department of Health
20  & Human Services Office of Inspector General (HHS OIG) and Office of Civil Rights (HHS
21  OCR). Since that time, Plaintiff had been corresponding with the federal agents either by email,
22  phone or in person. Plaintiff, along with her attorney, traveled to Washington DC to meet with
23  HHS OCR in person upstairs in the 200 Independence Ave SW building in winter 2019.

24  In July 28, 2017 Defendant Bholat et al seized the opportunity to retaliate against
25  Plaintiff for Plaintiff's federal reports on Defendant Bholat and signed the order for Plaintiff to
26  undergo a psychiatric evaluation with Defendant Lavid. During the exam, Plaintiff revealed to
27  Lavid she had been providing testimony to HHS OIG and HHS OCR. Lavid subsequently
28  concluded "no mental illness". Despite the lack of diagnosis, Defendants MBOC, CaDCA,

6

1    Becerra, Kirchmeyer, Alvarez, O'Carroll, Lawson, Beckloff, HiDCCA, SOC, Flanders, Hassler,

2    CviDHP, and FSMB subsequently over time pursued and supported the decision to confiscate

3    Plaintiff's property due to her alleged disability of mental illness, despite MBOC's own Board-

4    certified medical expert Lavid concluding no mental illness.  Despite the lack of mental illness,

5    Defendants filed an Interim Suspension Order ("ISO") to confiscate Plaintiff's property on

6    October 13, 2017.  Not surprisingly, the ISO was denied by the Judge. [EXHIBIT B]

7          Then on January 09, 2018 Defendant MBOC, et al filed an Accusation which is identical

8    to the ISO against Plaintiff to confiscate her property.  The Accusation also listed several

9    allegations related to clinic notes and patient care.  [EXHIBIT C, F] However, said Defendants

10   were unable to find a Board-certified internist to support their claims against the Plaintiff.

11   Instead, Defendant used a retired, non-Board certified medical expert Defendant Hilzinger who

12   never worked nor trained in internal medicine and failed in in his attempt for Board re-

13   certification in Family Medicine. [EXHIBIT E]

14         On January 17, 2018 Plaintiff filed a federal civil rights lawsuit against Defendant

15   MBOC et al in this same court (Case No. 2:18-cv-00105) for actions related to the ISO.

16         Throughout 2018, Plaintiff voluntarily paid thousands of dollars to attend three Physician

17   Assessment and Clinical Education ("PACE") courses for which she completed, passed, and

18   received CME credits and a certificate.  The courses are MBOC-supported and are typically

19   mandatory for clinicians after they have been disciplined by MBOC.

20         Plaintiff is the *only* clinician in MBOC's history to have completed three PACE courses

21   voluntarily, then had her property confiscated.  All other physicians who completed PACE

22   courses voluntarily were not revoked because they were white, not a person of color as is the

23   Plaintiff.

24         The Hearing to confiscate Plaintiff's property May 13-17, 2019 was brought by

25   Defendants Becerra, Alvarez, O'Carroll, Kirchmeyer, MBOC.  SOC witnesses Defendants Lavid

26   and Hilzinger provided biased and fraudulent testimony against Plaintiff describing her as

27   "acting strangely.. odd… fringes of societal norms" when in fact she was acting normally within

28   her race, ethnicity, and religious beliefs.  They had never used the same descriptive terms to

7

RHEE vs. MEDICAL BOARD OF CALIFORNIA, et al.

1 | describe white clinicians, only the Plaintiff who is a person of color.

2 |     Defendant Hilzinger admitted under oath he had never trained in internal medicine and
3 | that he does not treat the type of patients for which he was evaluating and cared for by the
4 | Plaintiff. He also admitted under oath he is not familiar with an internist's shorthand and style of
5 | notes by physiological systems rather than by patient complaints. Under oath, Defendant Lavid
6 | admitted he has never worked in racial and religious diversity, equity, inclusion but conceded it
7 | would be important and relevant for Board for Board-certified psychiatrists such as himself to
8 | have that type of work history in order to be an expert witness for SOC. Defendant Lavid again
9 | stated under oath Plaintiff has no mental illness nor mental disorder.

10 |     The official transcripts purchased by the Plaintiff during Lavid and Hilzinger's
11 | testimonies did not reflect what was stated during the Hearing. In fact, their testimonies were
12 | altered in such a way so as to conceal their disregard and blatant *hatred* toward people of color,
13 | collaborated by Plaintiff's attorney Benjamin Fenton. Parts of Defendant Lavid's testimony
14 | were altered and deleted to show SOC Defendants in a more positive light. Not coincidentally,
15 | the days in which the official transcripts were altered (May 13, 14, 15) were *not* signed and
16 | certified by Defendant Till. Defendant Corella is the CaOAH administrator charged with
17 | transcript oversight and fraudulently charged Plaintiff over $6000 for altered, uncertified
18 | transcripts. Without certified transcripts, Plaintiff is unable to fully defend herself in subsequent
19 | events, not limited to appeals. Hearing transcripts were signed and certified by Defendant Till
20 | for May 16 and 17 only, but not May 13, 14, 15. [EXHIBIT G]

21 |     Defendant King was the Administrative Law Judge ("ALJ") during the five day hearing.
22 | Due to her fraudulent and corrupt method of running her Hearings, Defendant King refused to
23 | allow Plaintiff any expert witnesses to testify on her behalf. In fact, King did not even allow
24 | Plaintiff to testify on her own behalf. Defendant King also redefined "standard of care" during
25 | the middle of the hearing which would allow any type of physician to testify as an expert in any
26 | field. For example, under Defendant King's ruling, a pathologist specializing in autopsies may
27 | testify as an expert witness in psychiatry because "both have the same standard of care"

28 | 8

1   according to Defendant King.  This decision was to favor SOC Defendants who used Board-
2   failed Family Medicine physician Hilzinger to be an expert witness in the standard of care for
3   internists, a field of medicine Hilzinger has never been trained nor worked in.  During the
4   hearing, Defendant King allowed outside attorneys representing OH to sit at the attorney table
5   with SOC Defendants to caucus together.  In her written decision June 2019, Defendant King
6   was the first and *only* individual to diagnose Plaintiff as disabled due to "Delusional disorder,
7   persecutory type" then proceeded to recommend confiscation of her property due to Defendant
8   King's diagnosis.

9        In July 2019, Defendant MBOC, Lawson and Bholat voted to diagnose Plaintiff with a
10   disability then proceed to confiscate her property due to having the alleged disability.

11        In 2021, Defendant HiDCCA, Hassler, Flanders, Hikida supported SOC's decision to
12   confiscate Plaintiff's property due to her alleged disability.  The confiscation prevented Plaintiff
13   from working in SOH.

14        In 2021, Defendant CViDHP also confiscated her property due to Plaintiff's supposed
15   disability.  SOC, SOH, COV were synchronized on confiscation of Plaintiff's property due to
16   alleged disability because of alliance and agreement through Defendant FSMB.  The latter is not
17   only in support of SOC, SOH, COV's decision, but Defendant FSMB published Plaintiff's
18   disability and details of her supposed medical condition online.  In fact, SOH and SOC have also
19   published her disability and health information under the title "Accusation" to clearly emphasize
20   that the presence of a disability is akin to a criminal act and crime against society.  They unjustly
21   justify penalizing the supposed disabled worker by confiscating their property for the sole
22   purpose of preventing them from working due to having that disability, then publicly shame the
23   disabled worker by posting details of their health information online on multiple websites
24   because confiscating their ability to work is not punishment enough according to the Defendants.

25        Defendant FSMB hosts a yearly forum to allow and coordinate such violations of civil
26   rights amongst its state members.  Additionally, their membership and voting rules ensure a high
27   morbidity and mortality rate amongst African-American patient cohorts whether intentionally or
28   by design.  In 2021, Defendant FSMB denied nonprofit Black Patients Matter membership

9

1
2 | stating they were "unqualified".

3 |      Defendant FSMB ensures an inequity amongst minority groups since the vast majority of
4 | its voting members have little to no significant work history promoting racial and religious
5 | diversity, equity and inclusion as evidenced on their otherwise lengthy resumes.

6 |      In October 2020, Plaintiff filed in CA circuit court *writ of administrative mandamus*.
7 | Without official certified hearing transcripts, Plaintiff was unable to fully defend herself, and
8 | thus it was denied. Defendant Beckloff the presiding Judge was in agreement that it was
9 | appropriate to confiscate property of the disabled to prevent them from working due to the
10 | disability.

11 |      Subsequently, Plaintiff has not been able to work in any meaningful capacity due to
12 | details of her supposed disability being posted publicly online. Plaintiff is mercilessly mocked
13 | by neighbors and family members for the supposed disability and was even banned from
14 | attending funeral services of her mother and beloved sister who died of COVID-19 three days
15 | apart in February 2021.

16 |      Defendant ABPN encourages Board-certification of its physicians who maintain an
17 | extensive resume which reads "I stay away from work promoting diversity, equity, and
18 | inclusion" along with "I stay clear of Black folks" as evidenced in ABPN Board-certified
19 | Defendant Lavid's resume. [EXHIBIT D]

20 |      (For clarification purposes, Defendants are being sued in the current federal lawsuit due
21 | to their actions related to the May 13-17, 2019 State hearing when they brought forth an
22 | "Accusation" against the Plaintiff. There is another federal lawsuit which relates to activities of
23 | Defendants' ISO dated August 2018 filed in State court. (*Rhee vs. Alvarez, et al*. 2:18-cv-105-
24 | DAD-DMC). However, the 2018 ISO is referenced here when relevant, such as the Plaintiff's
25 | double jeopardy claim for example.)
26
27
28 | 10

1

IV.    CAUSES OF ACTION

2

FIRST CAUSE OF ACTION

3

42 USC § 1983 – Racial, Religious, Disability Discrimination in Violation of the

4

Equal Protection Clause of the Fourteenth Amendment, 42 USC § 1981,

5

American Disabilities Act ("ADA")(42 USC § 12132),

6

§ 504 of the Rehabilitation Act, and

7

Title VI of the Civil Rights Act of 1964, 42 USC §2000d et seq ("Title VI")

8

(Against All Defendants)

9

10

Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth

11

herein.

12

Title 42 USC § 1983 provides that:

13

"Every person, who under color of any statute, ordinance, regulation, custom, or usage of

14

any state or territory or the District of Columbia subjects or causes to be subjected any citizen of

15

the US or other person within the jurisdiction thereof to the deprivation of any rights, privileges,

16

or immunities secured by the Constitution and law shall be liable to the party injured in an action

17

at law, suit in equity, or other appropriate proceeding for redress..."

18

Plaintiff in this action is a citizen of the US by birth and all of the Defendants to this

19

claim are persons for purposes of 42 USC § 1983.

20

All individual Defendants to this claim, at all times relevant hereto, were acting

21

under color of state law in their capacity as employees or agents of their respective States, and

22

their acts or omissions were conducted within the scope of their official duties or employment.

23

At the time of the complained events, Plaintiff had the clearly established constitutional

24

right to be free from racial, religious, and disability discrimination and to enjoy the equal

25

protection of the laws.

26

The Fourteenth Amendment of the US Constitution provides, in pertinent part:

27

"All persons born or naturalized in the US and subject to the jurisdiction thereof, are

28

citizens of the US and of the State wherein they reside.  No State shall make or enforce any law

11

which shall abridge the privileges or immunities of citizens of the US; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

42 USC § 12312 provides, in pertinent part:

"... no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."

§ 504 of the Rehabilitation Act provides, in pertinent part:

"No otherwise qualified individual with a disability in the US ... shall, solely by reason of her or his disability, be excluded from the participation in, or be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance or under any program or activity conducted by any Executive agent ..."

Title VI of the Civil Rights Act of 1964, 42 USC § 2000d et seq ("Title VI") provides, in pertinent part:

"No person in the US shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." (Pub.L. 88-352, Title VI, § 601, July 2, 1964, 78 Stat. 252)

Plaintiff, as a person of color, is a member of a protected class and thus has clearly established statutory rights under this provision of 42 USC § 1983 and Title VI to be free from racial, religious, and disability motivated misconduct brought by the Defendants.

In June 2019, the only individual who diagnosed Plaintiff with a mental illness/disorder is Defendant King who opined Plaintiff had "persecutory type delusional disorder." This diagnosis made by a judge with no medical training contradicts the SOC Defendants' court-ordered psychiatric evaluation by Board-certified Lavid in August 2017 who in fact concluded no mental illness/disorder. The latter was reiterated at a previous ISO hearing in October 2017 whereupon that ALJ denied SOC Defendants' petition for an ISO due to her alleged disability even though Lavid concluded no disability.

12

1    However, Defendant Lavid's descriptive terms of Plaintiff acting on the "fringes of
2  societal norm" was explained by Lavid as "acts which may be construed as paranoid" but several
3  studies have shown Plaintiff's traits are in fact "within normal limits" for someone of her race
4  and religious beliefs.  The description used by Defendant Lavid is in fact racially biased and
5  centered on his own white culture and limited religious knowledge and experiences and should
6  not be attributed to Plaintiff's norm as he lacks any work in racial nor religious diversity, equity,
7  and inclusion as evidenced on his resume.  In fact, his resume is a road map on "how to stay
8  away from Black folks." [EXHIBIT D]

9    Defendants SOC, Becerra, Alvarez, O'Carroll, Kirchmeyer, MBOC, Bholat discriminated
10  against  Plaintiff by ordering her to be evaluated by psychiatrist Defendant Lavid with no work
11  history in racial diversity, equity, and inclusion who then used traumatizing, racist descriptive
12  words toward the Plaintiff.  Those words were then used by Defendant King who *diagnosed*
13  Plaintiff with a mental illness/disorder despite the Judge having absolutely no medical training
14  nor work experience in racial diversity, equity, and inclusion as evidenced on her resume on file
15  with the CaOAH and SOC offices.  With no experience nor training in health care, Defendant
16  King diagnosed Plaintiff with a disability, then subsequently took possession of Plaintiff's
17  property because of having that disability which is a direct violation of Plaintiff's stated civil
18  rights, especially the ADA.  Defendants should have known their acts violate the ADA since
19  they are trained attorneys and receiving funds from the federal government, having taken an oath
20  to uphold the US Constitution.  Most importantly, Title II of the ADA prevents immunity to
21  Defendants since SOC abrogated their right to immunity when receiving federal disability funds.
22  In fact, Defendants MBOC and Kirchmeyer were also Defendants in another federal lawsuit
23  when Title II was upheld the *third* time by the US Ninth Circuit Court of Appeals.  As
24  recalcitrant repetitiously icthetic offenders, said SOC Defenders *knowingly* violated the ADA in
25  the present Plaintiff's case and should be held accountable for their acts. (*Hason v. Medical Bd.
26  Of CA*, 279 F.3d 1167 (9th Cir. 2002))

27    At the time the Accusation was filed on January 09, 2018, Plaintiff voluntarily completed
28  three Physician Assessment and Clinical Education ("PACE") courses generally mandated to

13

1  physicians sanctioned by MBOC at a cost of thousands of dollars (http://paceprogram.ucsd.edu/).

2  As a physician of color, Plaintiff is the *only* physician in the history of MBOC to have her

3  medical license revoked after voluntarily completing three PACE courses.  All other physicians

4  who completed three PACE courses voluntarily were all white and were allowed to continue

5  working.

6        The coordinated confiscation of a worker's property due to race, religious beliefs, and

7  disability is caucused through Defendant FSMB, a nationwide corporation whose acts are not

8  made public, yet gives itself the coordinated nationwide authority to confiscate property in direct

9  violation of civil rights.  If Defendant FSMB did not exist, then the unjust coordinated

10  confiscation of Plaintiff's property due to disability would not have occurred.

11        Of note, Defendant Kirchmeyer is a voting member of Defendant FSMB.  In 2019 after

12  being sued in federal court by nonprofit Black Patients Matter for civil rights violations,

13  Defendant was *promoted* by Defendant Newsom to Executive Director of Defendant CaDCA

14  which receives federal funding.

15        It is well-settled that Title VI support retaliation claims. (*Peter v. Jenney*, 327 F. 3d 307,

16  318 (4th Cir. 2003); *Chandamuri v. Georgetown Univ.*, 274 F. Supp. 2D 1,83 (DDC 2003));

17  (*Gutierrez v. Wash Dep't of Soc. & Health Servs.*, CV-04-3004-RHW, 2005 WL 2346956, at *5

18  ED Wash. Sept. 26, 2005).  The Supreme Court has defined retaliation as an intentional act in

19  response to a protected action and is therefore an act of discrimination:

20        "Retaliation is, by definition, an intentional act.  It is a form of "discrimination" because

21  the complainant is being subjected to differential treatment." (Gutierrez, 2005 WL 2346956, at

22  *5)  "The very concept of retaliation is that the retaliating party takes action against the party

23  retaliated against after, and because of, some action of the latter." (*Fed. Mar. Bd. v. Isbrandtsen

24  Co.*, 356 US 481, 415 (1958))

25             "Retaliation is a deliberate action used to send a clear message that complaining is

26  unwelcome and risky.  It is employed to instill fear in others who might consider making a

27  complaint in the future.  Those with cause for complaining are frequently among the most

28  vulnerable in an institution.  Once they complain, they are labeled as 'troublemakers.'

14

Retaliation, and the fear of retaliation, becomes a potent weapon used to maintain the power structure within the institution." (US Dep't of Justice; Boensteiner. *The Risk of Complaining – Retaliation*, 38 JC & UL 1,1 (2001).

Defendants MBOC, Becerra, Alvarez, O'Carroll, King retaliated against Plaintiff for being a federal whistleblower and filing numerous federal complaints for their discriminatory and retaliatory actions by labeling her as "delusional", then revoking her medical license to discredit her complaints against them along with OH for running a "pill mill" and to also discredit Plaintiff's federal health assessment reports of Defendant Bholat's substandard care of her UCLA Family Medicine elderly and disabled patients as referenced earlier.

The level of corruption in the SOC Defendants is coordinated, tolerated, and ubiquitous with few willing to challenge the State players. Defendant King corrupted her position by diagnosing Plaintiff with a disability despite an MBOC, SOC-appointed Board-certified psychiatrist stating otherwise. Defendants Becerra, Alvarez, O'Carroll corrupted their position by filing a deceitful ISO and Accusation stating Plaintiff had a mental disorder when in fact their MBOC, SOC-appointed Board-certified psychiatrist stated otherwise.

Corruption is when a member of the public pays over $6000 for official certified hearing transcripts and was instead fraudulently given altered, deleted transcripts by Defendant Corella of Defendant CaOAH which Defendant Till failed to sign and certify. Corruption is when Defendant Newsom promotes repetitiously recalcitrant ictheric offender of civil rights Defendant Kirchmeyer to Director of CaDCA despite her actions against nonprofit Black Patients Matter and the Plaintiff.

Defendants HiDCCA, Hikida, Flanders, Hassler, CviDHP, FSMB also violated Plaintiff's civil rights. Despite knowing the Plaintiff was diagnosed as disabled by SOC Defendant King, these Defendants chose to violate Plaintiff's rights and confiscate her property to prevent her from working due to having the supposed disability. SOH and COV Defendants were able to coordinate the unjust confiscation of her property due to their agreements with Defendant FSMB who is in support of their actions.

Any reasonably competent individual knows or should have known of these civil

15

1  rights when their Complaint was filed as they were clearly established at that time.  However,

2  they chose to discriminate and retaliate against Plaintiff for initiating then pursuing her sentinel

3  whistleblower complaint of OH running a pill mill.

4

5                              SECOND CAUSE OF ACTION

6            42 USC § 1983 – Double Jeopardy in Violation of the Fifth Amendment

7                           (Against Said Defendants Below)

8            Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set

9  forth herein.

10           42 USC § 1983 provides that:

11           "Every person, who under color of any statute, ordinance, regulation, custom, or

12  usage of any state or territory or the District of Columbia subjects or causes to be subjected any

13  citizen of the US or other person within the jurisdiction thereof to the deprivation of any rights,

14  privileges, or immunities secured by the Constitution and law shall be liable to the party injured

15  in an action at law, suit in equity, or other appropriate proceeding for redress ..."

16           Any individual Defendant to this claim, at all times relevant hereto, were acting

17  under the color of state law in their capacity as employees or agents of their respective States and

18  their acts or omissions were conducted within the scope of their official duties or employment.

19           The Fifth Amendment to the US Constitution states:

20           "No person shall ... be subject for the same offense to be twice put in jeopardy of

21  life or limb ..."

22           The double jeopardy clause protects against: 1) a second prosecution for the same

23  offense after acquittal, 2) a second prosecution for the same offense after conviction, and 3)

24  multiple punishments for the same offense (*US v. Harper*, 490 US 435, 439, 109 S.Ct. 1892,

25  1897, 104 L.Ed. 872(1874)).  In Shirley, the court explained that the double jeopardy rule

26  "achieves its aim – i.e., of protecting the Defendant against the harassment and risks of

27  unnecessary repeated trials on the same charge." (*People v. Shirley* 31 Cal. 3D 18 (Cal. 1982).

28           Defendants Becerra, Alvarez, O'Carroll, SOC violated Plaintiff's Fifth

16

Amendment rights by trying Plaintiff twice (October 2017 ISO, May 2019 Accusation) for the same offenses occurring at the same events with no new evidence nor testimony presented.  The Decision and Order from October 2017 ISO reads in part:

> "Dr. Lavid evaluated respondent and found no DSM V diagnosis.  In addition, he found respondent tested within normal limits on *three* diagnostic instruments.  However, Dr. Lavid also diagnoses respondent with 'thoughts that can be construed as paranoia.'  Here, Dr. Zaslav makes clear the purpose and intent of the DSM V, as a rigorous diagnostic tool 'intended precisely to preclude misuse of *vague psychiatric terms of art* such as 'paranoia' (or formal thought disorder) by replacing them with clinical syndromes having concrete, carefully researched, objective diagnostic criteria.'  Here, Zaslav's explanation is compelling.  Without a DSM V diagnosis, the Board failed to establish that respondent suffers from a mental illness as contemplated by Business and Professions Code section 820 and 822."

SOC Defendants petition in CaOAH to confiscate Plaintiff's property due to alleged disability, unprofessional conduct, gross negligence, and falsifying medical records was denied, and Plaintiff continued working.  [EXHIBIT B]

Then in the May 2019 Accusation hearing at CaOAH, SOC Defendants again petitioned the Judge to confiscate Plaintiff's property due to alleged disability, unprofessional conduct, gross negligence, and falsifying medical records based on the *same* events and the *same* evidence in direct violation of her Fifth Amendment rights.  The *only* significant difference between the two dates was the sitting Judge.  In the latter hearing, Defendant King inserted her own medical diagnosis of Plaintiff as having "Delusional disorder, persecutory type" in the spirit of double jeopardy so as to find Plaintiff guilty resulting in her property being confiscated for having a supposed disability.  It goes without saying Defendant King has absolutely no training nor work experience in the medical field let alone in psychiatry, but enjoys using false identities on social media accounts so as to express her disdain and bias towards minorities such as the Plaintiff.  Judge King's actions are nothing less than fraudulent and the quintessential definition of abuse in the judicial system while acting under color of law.  Sadly, Judge King's other fraudulent acts toward the judicial system will be addressed in the following pages under other

17

1    causes of actions.

2            In fact, Plaintiff's rights were further violated by said Defendants.  After the May

3    2019 hearing, her first punishment was the confiscation of her property.  The second punishment

4    was the publication online by Defendants MBOC, CaDCA, FSMB, HiDCCA of her alleged

5    disability and health information which was presented under "Accusation" in effect accosting

6    and ridiculing her for allegedly having mental health issues and a disability.  The latter was

7    punitive in that Plaintiff suffered emotional distress, humiliation, public ridicule, loss of friends

8    and familial relationships, and inability to earn a living.

9

10                            THIRD CAUSE OF ACTION

11              42 USC § 1983, 5 USC § 552(b)(7)(c) – Right to Privacy

12                          (Against Said Defendants Below)

13           Plaintiff hereby incorporates all other paragraphs of this Complaint as it fully set forth

14    herein.

15           42 USC § 1983 provides that:

16           "Every person, who under color of any statute, ordinance, regulation, custom, or usage of

17    any state or territory or the District of Columbia subjects or causes to be subjected any citizen of

18    the US or other person within the jurisdiction thereof to the deprivation of any rights, privileges,

19    or immunities secured by the Constitution and law shall be liable to the party injured in an action

20    at law, suit in equity, or other appropriate proceeding for redress ..."

21           All individual Defendants to this claim, at all times relevant hereto, were acting under the

22    color of state law in their capacity as employees or agents of their respective States and their acts

23    or omissions were conducted within the scope of their official duties or employment.

24           The Supreme Court has recognized a person's right to privacy in the confidentiality of

25    one's medical records, derived implicitly from the US Constitution.  (*Whalen v. Roe*, 429 US

26    589, 599-600, 97 S. Ct. 869, 876-77, 51 L.Ed. 2D 64 (1977); *Doe v. Attorney General of US.*,

27    941 F.2d 780, 795-96 (9th Cir. 1991).  A citizen's right to privacy is protected by 5 USC § 552(b)

28    (7)(C).  (*Nat'l Archives & Records Admin. v. Favish*, 541 US 157 (US 2004)).

                                        18

However, the privacy interest in medical records is not absolute (*Pagano v. Oroville Hosp., 145 FRD at 696-7).* The State's interest must be balanced against the patient's right to maintain private medical records. (*Hawai'i Psychiatric Soc'y v. Ariyoshi*, 481 F. Supp. 1028, 1043 (D. Haw. 1979)).

Defendants MBOC, CaDCA, HiDCCA, FSMB violated Plaintiff's right to privacy by publicly publishing her health information without consent and without justifiable reasons. Since the Plaintiff already had her property confiscated by said Defendants and is unable to work as a physician, there is no threat to the public. In addition, the alleged delusional disorder was not diagnosed by a clinician but by Defendant King, a trained lawyer and administrative law judge prone to criminally fraudulent activities in her courtroom. In addition, the diagnosis is very specific in that her alleged paranoia is only directed toward hospitals which would not threaten the general public. Plaintiff has spent the last 30 years in medicine and has never been accused of being "paranoid" despite being surrounded by clinicians, surgeons, nurses, clinical instructors, psychiatrists, psychologists, social workers and undergoing thousands of hours of examinations and evaluations. Plaintiff has no criminal record, substance use, insurance claims, speeding tickets or even parking tickets. In essence, what the Defendants have done in filing then pursuing the "Accusation" is racist labeling, publicly mocking and humiliating an alleged disabled person, then confiscating her property while publicly blaming her for being disabled under a published document entitled "Accusation".

FOURTH CAUSE OF ACTION

42 USC § 1983 – Abuse of Process in Violation of

Fifth and Fourteenth Amendments

(Against Said Defendants Below)

Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

19

1    42 USC § 1983 provides that:

2    "Every person, who under color of any statute, ordinance, regulation, custom or
3    usage of any state or territory or the District of Columbia subjects or causes to be subjected a
4    citizen of the US or other person within the jurisdiction thereof to the deprivation of any rights,
5    privileges, or immunities secured by the Constitution and law shall be liable to the party injured
6    in an action at law, suit in equity, or other appropriate proceeding for redress ..."

7    All individual Defendants to this claim, at all times relevant hereto, were acting
8    under color of state law in their capacity as employees or agents of their respective States and
9    their acts or omissions were conducted within the scope of their official duties or employment.
10   At the time of the complained events, Plaintiff had the clearly established constitutional right to
11   due process.

12   The Fifth Amendment provides that:

13   "No person ... shall be deprived of life, liberty, or property, without due process
14   of law."

15   The Fourteenth Amendment provides that

16   "... nor shall any State deprive any person of life, liberty, or property, without due
17   process of law."

18   The essential elements of misuse or abuse of process "are an ulterior motive and
19   some further act after the issuance of process representing the perversion of the legitimate use of
20   the process." (*Simone v. Golden Nugget Hotel & Casino*, 844 F.2d 1031, 1036-37 (3rd Cir. 1988))
21   Defendants MBOC, Becerra, Alvarez, O'Carroll, CaDCA, Kirchmeyer violated Plaintiff's right
22   to due process during the May 2019 hearing by using verbal and written testimony from
23   Defendant Lavid and Hilzinger who have no work experience in racial and religious diversity,
24   equity, and inclusion as evidenced on their resumes. As a religious person of color, Plaintiff has
25   a right to due process by being examined by an agent of SOC with significant recent work
26   history in racial and religious diversity, equity, and inclusion. When describing the Plaintiff,

27

28

20

1  Defendant Lavid's term of Plaintiff as on the "fringes of societal norms" he never uses on his

2  white patients, only on people of color such as the Plaintiff. As stated earlier, fraudulent

3  Defendant King has *never* diagnosed a white defendant with a psychiatric illness, only the

4  Plaintiff who is a person of color. Plaintiff therefore has a constitutional right to be properly

5  examined and diagnosed by a clinician, not by a trained lawyer such as Defendant King.

6  Defendants were unable to find a single Board-certified psychiatrist in the entire United States

7  who would diagnose Plaintiff with a mental illness, so out of desperation Defendant King illicitly

8  diagnosed Plaintiff with a mental disorder while acting under color of state law as a SOC Judge.

9         As stated earlier, the enormity at which the Defendants' criminal activities occurs knows

10  no bounds. Defendants Becerra, Alvarez, O'Carroll, MBOC, King, Corella, and Till not only

11  conspired to violate Plaintiff's civil rights, but to also *criminally* delete parts of the official

12  hearing transcripts from May 2019. But alas, they not only deleted parts of the official hearing

13  transcripts, but also *altered* the expert testimonies of Defendant Lavid and Hilzinger so as to

14  falsely show less racial bias and bigotry against the Plaintiff. Then to add insult to injury, they

15  then demanded over $6000 for fraudulent hearing transcripts. Therefore, Defendant Till is an

16  eyewitness to their criminal activity and abuse of process by refusing to sign and certify the

17  hearing transcripts for May 13, 14, 15 which coincides with the deleted and altered testimonies

18  of Defendants Lavid and Hilzinger as also witnessed by Plaintiff's attorney at the time Benjamin

19  Fenton. Defendant Till failed to notify and report her concerns regarding the official transcripts,

20  so therefore she becomes a co-conspirator to their criminal activity. [EXHIBIT G]

21         For what other reason would it be necessary for a transcriptionist to sign and certify

22  hearing transcripts? Is her signature not to ensure justice, equity, fairness to all parties? Perhaps

23  once upon a time the Courts found there was a problem with official transcripts being altered and

24  thus required the transcriptionist to sign and certify them. In any event, it is not only an abuse of

25  process but also criminal to charge Plaintiff over $6000 for official hearing transcripts then

26  deliver an altered non-certified product. Without certified transcripts, Plaintiff was unable to

27  justly represent herself at the *writ of administrative mandamus* hearing, whereupon Defendant

28  Beckloff denied the *writ* without acknowledging Plaintiff's right to due process.

1     The cohesive unionized Defendants' purpose in denying Plaintiff due process was to
2 confiscate her property, soil her reputation in retaliation for being a federal whistleblower going
3 all the way back to evaluating elderly and disabled patients of Defendant Bholat's UCLA Family
4 Medicine clinic. The structural racism and corruption in the SOC is well rehearsed and
5 intentional. In a similar case of retaliation where a whistleblower was unjustly labeled as
6 mentally ill, the Court opined in addressing Defendant's motion to dismiss:

7     "The Plaintiff's allegations may be difficult to prove … but at this stage, the issue is only
8 whether the factual content alleged by the Plaintiff, accepted as true 'allows the Court to draw
9 the reasonable inference that the Defendant is liable for the conduct alleged'." (Iqbal, 129 S.Ct.
10 At 1949; *Williams v. City of NY*, 16 Civ. 4315 (JGK), at *18(SDNY Sept. 14, 2017).

## FIFTH CAUSE OF ACTION

### 42 USC § 1983 – Intentional Infliction of Emotional Distress

### (Against Said Defendants Below)

15     Plaintiff hereby incorporates all of the paragraphs of this Complaint as if fully set forth
16 herein.

17     42 USC § 1983 provides that:

18     Every person, who under color of any statute, ordinance, regulation, custom or usage of
19 any state territory or the District of Columbia subjects or causes to be subjected any citizen of the
20 US or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or
21 omissions were conducted within the scope of their official duties or employment.

22     The tort of intentional infliction of emotional distress has four elements: 1) Defendant
23 must act intentionally or recklessly; 2) Defendant's conduct must be extreme and outrageous;
24 and 3) the conduct must be the cause (4) of severe emotional distress. (*Hyatt v. Trans World*
25 *Airlines, Inc.*, 943 SW 2d (Mo. Ct. App. 1997))

26     At the time of the complained events Plaintiff had the clearly established constitutional
27 right to live without intentional infliction of emotional distress brought on by all of the
28 Defendants.

22

RHEE vs. MEDICAL BOARD of CALIFORNIA, et al.

1        Defendants Bholat, Becerra, Kirchmeyer, Alvarez, O'Carroll, King, MBOC, Lawson,
2    Newsom's primary purpose against Plaintiff was to retaliate against her for being a federal
3    whistleblower.  The mechanism of retaliation would not be effective and serve its purpose if it
4    didn't intentionally inflict emotional distress.  Said Defendants intentionally inflicted emotional
5    distress upon first petitioning for confiscation of her property due to supposed disability (i.e.
6    ISO) when in fact their own psychiatrist diagnosed no mental illness;  their petition was
7    rightfully denied.  Defendants knew their actions would emotionally stress Plaintiff since she
8    repeatedly stated as such since November 2015.  Then although Defendants were denied their
9    ISO petition in October 2017, they then pressured Defendant King into diagnosing Plaintiff with
10   a mental illness "from the bench" despite their own medical expert Defendant Lavid
11   documenting and testifying Plaintiff has no mental illness.  Defendants then conspired with
12   Defendant Corella to alter the May 2019 hearing transcripts to favor the SOC medical expert
13   testimonies of Defendants Lavid and Hilzinger, thereby preventing Plaintiff the right to due
14   process by not allowing her a true and accurate copy of the hearing transcripts so as to justly
15   defend herself in any appeal process.

16       Defendant King intentionally prohibited Plaintiff from having any expert witnesses
17   testify on her behalf, including the Plaintiff herself.  Defendant knew this would be emotionally
18   stressful for the Plaintiff because she stated as such multiple times during the hearing.

19       Defendant Kirchmeyer purposely acted on Plaintiff to inflict emotional distress by
20   deciding steps which led to confiscation of her property due to alleged disability in violation of
21   multiple civil rights, most importantly in violation of the ADA.  Defendant knew her acts were
22   unjust because she was a previous Defendant in an identical lawsuit addressing the same
23   discrimination complaints against disabled workers. (*Hason v. MBOC, Kirchmeyer et al*, 279
24   F.3d 1167, 1171 (9th Cir. 2002).  After the 9th Circuit reached their decision in support of the
25   disabled physician Plaintiff Hason thereby upholding Title II, Defendant Kirchmeyer petitioned
26   the 9th Circuit Court to reconsider their decision, the latter declined Kirchmeyer's request.
27   Thereafter, the Supreme Court agreed to hear Kirchmeyer's case, however the latter withdrew
28   the case, granted Hason a medical license, and currently has a website allowing physicians with

disabilities to apply for licensure. Therefore, it goes without saying said Defendants knew they were personally and professionally liable for confiscating property due to disability yet continues to do so as in the current case. For this, Defendants clearly intended to inflict emotional distress on Plaintiff in flagrant disregard of her civil rights.

Defendants of Virginia and Hawai'i also intentionally inflicted emotional distress by confiscating her property because of her alleged disability as diagnosed by Defendant King which prevented her from working in their respective States. Said Defendants had all the same information about the criminally corrupt California entities and violations of Title II, but chose to blatantly violate the rights of the alleged disabled by preventing Plaintiff from working due to a supposed disability.

Existential law dictates one reputation per lifetime. Stated Defendants have repeatedly violated Plaintiff's civil rights so as to permanently damage her reputation for as long as her personal health information is made public and her property is unjustly confiscated. The acts of the Defendants are outrageous and caused unimaginable emotional distress to the Plaintiff.

SIXTH CAUSE OF ACTION

INJUNCTIVE RELIEF

(Against All Defendants)

Plaintiff hereby incorporates all other paragraphs of this complaint as it fully set for herein.

Rule 65 governs the issuance of injunctions (Fed. R. Civ. P 65). A Plaintiff seeking relief must establish "1) that he is likely to succeed on the merits, 2) that he is likely to suffer irreparable harm in the absence of preliminary relief, 3) that the balance of equities tips in his favor, and 4) that an injunction is in the public interest." (*Doe v. Reed*, 586 F.3d 1045, 1049-50 (9th Cir. 2010), rev'd on other grounds (632 F. 3d 1127 (9th Cir. 2011)) Thus, a Court may grant relief where a Plaintiff demonstrates "that serious questions going to the merits were raised and the balance of hardships tips sharply in the Plaintiff's favor" (Id. At 1052 (internal quotations omitted). In other words, where a Plaintiff is unable to show a likelihood of success on the

24

1  merits but can at least demonstrate that there are serious questions going to the merits, and the

2  balance of hardships strongly favors the Plaintiff, a Court may grant preliminary injunctive relief

3  so long as there is still a showing on the last two elements. (*Alliance for Wild Rockies*, 632 F 3d

4  at 1131, 1134-5)([A] stronger showing of one element may offset a weaker showing of another.

5  For example, a stronger showing of irreparable harm to Plaintiff might offset a lesser showing of

6  likelihood of success on the merits.").

7       Due to the ictheric nature of Defendant Kirchmeyer and MBOC's incorrect beliefs of

8  immunity when confiscating property of the disabled and the US 9th Circuit Court of Appeals

9  *thrice* ruling against the Defendants in favor of Title II and ADA in identical lawsuits to the

10  current one, Plaintiff will likely succeed on the merits against all Defendants which receive

11  federal funding. (*Hason v. MBOC, Kirchmeyer et al*, 279 F.3d (9th Cir. 2002)

12       Additionally, as existential laws dictate one reputation per lifetime, the harm brought on

13  by the public posting online of Plaintiff's personal health information under "Accusation" on

14  multiple websites owned and operated by Defendants in California, Hawai'i, Virginia, FSMB of

15  an alleged disabled individual has caused irreparable harm to the Plaintiff. Sadly, due to their

16  public postings, Plaintiff was prevented from attending the memorial and funeral services of her

17  beloved sister and mother who died from COVID-19 complications three days apart. Plaintiff

18  will never be able to repair the emotional harm done to her due to the actions of the Defendants.

19       Plaintiff is unable to maintain meaningful work due to the public postings. The balance

20  of inequities is in Plaintiff's favor. The coordinated actions of Defendant FSMB to purposely

21  support SOH, SOC, and COV into publicly posting details of a person's alleged disability under

22  "Accusation" clearly defines disability as a crime and serves no legitimate public purpose. Her

23  alleged disability is highly (an unusually) specific as stated by Defendant King. The alleged

24  persecutory delusional disorder is only toward hospitals and not the general public.

25       Plaintiff is entitled to equitable relief, in the form of mandatory injunctions, requiring

26  Defendants to cease and desist their illegal action of confiscating property belonging to the

27  Plaintiff and posting her health information for public viewing. Defendants must be required to

28  follow the statutory and regulatory rules set down by their respective legislatures to ensure that

25

1  physician discipline is justly conducted in a fashion to both protect the public and to honor and
2  protect workers' constitutional rights to due process, equal protection under the law, privacy, as
3  well as freedom from double jeopardy, abuse of process, and intentional infliction of emotional
4  distress.

5        Plaintiff's race, religion, alleged disability, and retaliation were motivating factors in the
6  decision to use any means necessary to confiscate her property and then deliberately and unjustly
7  prosecute Plaintiff with fraudulent "Accusations" to intentionally inflict emotional distress.
8  Defendants' conduct was undertaken with the purpose of depriving Plaintiff of equal protection
9  and benefits of the law, equal privileges and immunities under the law, and due process in
10  violation of the Fourteenth Amendment and § 1981.

11        Defendants engaged in the described conduct willfully, maliciously, in bad faith, and in
12  reckless disregard to Plaintiff's federally protected rights. The acts and omissions of all
13  individual Defendants were moving forces behind Plaintiff's injuries. These individual
14  Defendants acted in concert and in joint action with each other.

15        As a proximate results of all Defendants' unlawful conduct and actions listed above,
16  Plaintiff has suffered actual emotional injuries, and other damages and losses as described herein
17  entitling her to compensatory and special damages. As a further result of the Defendants'
18  unlawful reputation, loss of income opportunities and related expenses will continue to incur
19  further and other special damages related expenses.

20        On information and belief, Plaintiff will suffer lost future earnings and impaired earnings
21  capacities from the not yet fully ascertained damage to her reputation in the medical community,
22  in amounts to be ascertained in trial. Plaintiff is further entitled to attorneys' fees and costs
23  pursuant to 42 USC § 1988, prejudgment interest and costs as allowable by federal law.

24        In addition to compensatory, economic, consequential and special damages, Plaintiff is
25  entitled to punitive damages against each of the individually named Defendants under 42 USC §
26  1983, in that the actions of each of these individual Defendants have been taken maliciously,
27  willfully or with a reckless wanton disregard of the constitutional and statutory rights of the
28  Plaintiff.

26

1

PRAYER

2  WHEREFORE, Plaintiff demands judgment against Defendants as follows:

3      1. For all damages stated above, Plaintiff seeks $1,000,000 from each Defendant

4      2. For injunctive relief enjoining Defendants from filing Accusation and other actions in

5  pursuit of confiscation of Plaintiff's property.

6      3. For injunctive relief enjoining Defendants from publicly releasing any and all personal

7  health information and details related to the confiscation of her property as its purpose is to

8  intentionally inflict emotional distress.

9      4. Require all employees and contracted workers of States which receive federal

10 disability funding to have significant recent work experience in racial and religious diversity,

11 equity, and inclusion for the disabled as evidenced on their resume.

12     5. For such other and further relief as the Court deems just and proper.

13

14

15

16     Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my

17 knowledge, information, and belief that this complaint: (1) is not being presented for an

18 improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of

19 litigation; (2) is supported by existing law or by a non-frivolous argument for extending,

20 modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if

21 specifically so identified, will likely have evidentiary support after a reasonable opportunity for

22 further investigation or discovery; and (4) the complaint otherwise complies with the

23 requirements of Rule 11.

24

25 I agree to provide the Clerk's Office with any changes to my address where case-related papers

26 may be served. I understand that my failure to keep a current address on file with the Clerk's

27 Office may result in the dismissal of my case.

28

27

1 | Pro se Plaintiff requests trial by jury.

2 |                              Respectfully submitted,

Hanna Q. Rhee, MD

PRO SE PLAINTIFF

04 07 2023

28

EXHIBIT A

1   XAVIER BECERRA
    Attorney General of California
2   ALEXANDRA M. ALVAREZ
    Supervising Deputy Attorney General
3   MEGAN R. O'CARROLL
    Deputy Attorney General
4   State Bar No. 215479
     1300 I Street, Suite 125
5   P.O. Box 944255
    Sacramento, CA  94244-2550
6   Telephone:  (916) 324-5288
    Facsimile:  (916) 327-2247
7

*Attorneys for Complainant*

8

9

10                        **BEFORE THE**
           **MEDICAL BOARD OF CALIFORNIA**
11       **DEPARTMENT OF CONSUMER AFFAIRS**
               **STATE OF CALIFORNIA**
12

13

14   In the Matter of the Petition for Mental     Case No. 800-2015-018187
    Evaluation of:
15                             **ORDER COMPELLING MENTAL**
                            **EXAMINATION**
16   Hanna Queen Rhee, M.D.,
    912 Hazel Street                    (Bus. & Prof. Code § 820)
17   Gridley, California 95948-2114

18   Physician's and Surgeon's Certificate No.
    A 116932
19

20                     Respondent.

21

22         The Executive Director of the Medical Board of California ("Board"), having petitioned the

23   Board pursuant to Business and Professions Code section 820 for an Order to Compel Hanna

24   Queen Rhee, M.D. ("Respondent") who has Physician's and Surgeon's Certificate No. A 116932

25   to undergo a mental examination; and having read and considered the Petition to Compel the

26   Mental Examination of Hanna Queen Rhee, M.D. and all supporting documents, declarations and

27

28

1

1  exhibits, it hereby appears to the Board that Respondent may be unable to practice medicine

2  safely because her ability to practice is impaired due to mental illness affecting competency;

3      IT IS HEREBY ORDERED, pursuant to Business and Professions Code section 820,

4  that:

5      1.    Immediately upon service of this Board's Order, Respondent shall make herself

6  available to submit to a mental examination, including psychological testing, by one or more

7  physicians and surgeons and/or psychologists (collectively "the Examiners") appointed by the

8  Board or its designee;

9      2.    Immediately upon service of the Board's Order, to facilitate the providing of

10  current, updated and complete medical records to the Examiners, Respondent shall sign and

11  provide to the Board releases for complete, updated psychiatric records from all psychiatric

12  providers seen for the preceding five years;

13      3.    The Examiners shall receive all relevant documentation that the Board shall in

14  its discretion provide, including, but not limited to certified copies of psychiatric records of

15  Respondent, reports of investigation, attachments to reports of investigation, declarations of

16  Board personnel and a current certificate of licensure;

17      4.    The mental examination and testing shall be conducted at times convenient to

18  Respondent and the Examiners, but not later than twenty (20) days from the date of the service of

19  this Order (except at the request of one or more of the Examiners);

20      5.    The Examiners shall be directed to determine whether Respondent is impaired

21  due to a mental illness, which affects her competence to practice medicine safely;

22      6.    The Examiners shall provide detailed written reports of the findings and

23  conclusions of their examinations of Respondent;

24      7.    The reports of the Examiners may be received as direct evidence in any

25  administrative proceedings that may be filed as a result of the mental examination and testing;

26  and

27

28

2

1          8.    The failure of Respondent to comply with this Order shall constitute grounds

2  for disciplinary action suspending or revoking his Physician's and Surgeon's Certificate pursuant

3  to Business and Professions Code sections 821, 2220, and 2234.

4  IT IS SO ORDERED THIS <u>28th</u> DAY OF <u>  July  </u>, 2017.

5

6

7

8                                  FOR THE MEDICAL BOARD OF CALIFORNIA.
                                   DEPARTMENT OF CONSUMER AFFAIRS

9                                   Michelle Anne Bholat, M.D.
                                   Chair, Panel B

10

11  SA2017304862
    32932384.doc

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3

EXHIBIT   B

BEFORE THE
OFFICE OF ADMINISTRATIVE HEARINGS
STATE OF CALIFORNIA

|  |  |
|---|---|
| In the Matter of the Petition for Interim Suspension Order:<br><br>KIMBERLY KIRCHMEYER, Executive Director, Medical Board of California,<br><br>                        Petitioner,<br><br>v.<br><br>HANNA QUEEN RHEE, M.D.<br>Gridley, Ca.<br><br>Physician' and Surgeon's Certificate No. A 116932,<br><br>                        Respondent. | Case No. 800-2015-018187<br><br>OAH No. 2017100602 |

## DECISION AND ORDER ON PETITION FOR INTERIM SUSPENSION

This matter was heard before Erin R. Koch-Goodman, Administrative Law Judge, Office of Administrative Hearings (OAH), State of California, on October 30, 2017, in Sacramento, California.

Megan O'Carroll, Deputy Attorney General, appeared on behalf of Kimberly Kirchmeyer (petitioner), Executive Director, Medical Board of California (Board), Department of Consumer Affairs.

John Fleer, Attorney at Law, appeared and represented Hanna Queen Rhee, M.D. (respondent), who was present.

Declarations and other documentary evidence were received, oral arguments were presented, the record was closed, and the matter was submitted for decision on October 30, 2017.

1

# FACTUAL FINDINGS

1.      On May 11, 2011, the Board issued respondent Physician's and Surgeon's Certificate (license) No. A 116932. Respondent's license is in full force and effect until August 31, 2018, unless renewed or revoked. Respondent's license has no history of discipline.

*Complaint*

2.      On November 16, 2015, Orchard Hospital Medical Specialty Center (Orchard) filed a Health Facility/Peer Review Reporting Form (805 Complaint) with the Board. Orchard alleged respondent resigned during a peer review investigation, regarding provider and patient complaints about her patient care.

*Board Investigation*

3.      The Board reviewed the 805 Complaint, opened an investigation, and assigned the case to Investigator Roberto Moya. Investigator Moya subpoenaed documents from Orchard to determine the basis for the peer review investigation of respondent. Orchard fully complied with the Board subpoena in or about November 2016. Investigator Moya reviewed the documents and determined the Orchard investigation began as a result of a number of patient and staff complaints about respondent's behavior and clinical competence. On January 3, 2017, Investigator Moya interviewed respondent.

BOARD EXPERT - RICHARD HILZINGER, M.D., FAMILY MEDICINE

4.      On May 19, 2017, the Board retained Dr. Hilzinger, asking him to identify any departures from the standard of care from a review of materials, including an audio recording and transcript of respondent's Board interview, Investigator Moya's Report, and records from Orchard.[1] Dr. Hilzinger issued a Report on May 31, 2017, opining respondent committed both simple and extreme departures from the standard of care in her treatment of nine patients.[2]

5.      Dr. Hilzinger completed his Bachelor of Art in Biology at Carroll College, in Helena, Montana, in 1977, before earning his Medical Degree at the Medical College of Wisconsin, Milwaukee, in 1985. Thereafter, Dr. Hilzinger completed a three-year residency in family practice at St. Luke's Hospital, at the Medical College of Wisconsin. He was licensed to practice in California in 1989, and became a Diplomat for the American Board of Family Medicine in 1988. Dr. Hilzinger practiced as a family physician for 25 years with Sutter Medical Group. Currently, he is semi-retired, but assists with orthopedic surgeries.

---

[1] Neither Investigator Moya's Report nor the Orchard materials were offered at hearing. Investigator Moya's findings were offered via his eight-page declaration.

[2] Dr. Hilzinger's Report was not offered at hearing, only his three-page declaration.

6.    By declaration, Dr. Hilzinger raised concerns about respondent's lack of basic medical knowledge and medical record keeping. In general, he found: "she [respondent] lacked a logical thought process in her approach to treating the patient. The records were disorganized with incomplete or contradictory examinations. In most of the cases I reviewed she did not have a differential diagnosis, and the treatment plan she developed was not logically related to the physical symptoms reported or the assessment charted."

7.    Specifically, Dr. Hilzinger found respondent's care and treatment of four patients, ML, JG, CC, and JB, represented extreme departures from the standard of care. For Patient ML, respondent failed to examine or take a history of ML before concluding he was suffering from a cardiac event and administering nitroglycerin; here, Dr. Hilzinger relies on "the records and investigative interviews" to form his opinion. For Patient JG, respondent documented a physical examination she did not perform; here, Dr. Hilzinger does not identify a source for his conclusion, but most likely, believes the complaints filed against respondent indicating she does not touch patients. For Patient CC, respondent failed to examine Patient CC before referring her to the emergency department to have a hand rash treated; here, Dr. Hilzinger references the emergency room physician note, which stated: Patient CC had the same bandages on her hand before and after she saw respondent. For Patient JB, respondent failed to examine Patient JB or order any diagnostic tests for his complaints of scrotal pain; here, Dr. Hilzinger points to respondent's Board interview to contradict the medical record in order to form his opinion.

8.    In sum, Dr. Hilzinger developed the opinion that respondent might suffer from a formal thought disorder, affecting her ability to provide competent medical care to patients. Dr. Hilzinger pointed to respondent's Board interview, stating: "her interview . . . reflected a lack of balance, reasonable speech and thought. She frequently employed circumstantial and tangential speech patterns, with unusually formal words or phrases. She occasionally took long pauses before responding to questions. She was preoccupied with concerns that others in the clinic were mistreating her or attempting to alter her medical records if she failed to "lock" them electronically. She was highly suspicious that coworkers were involved in illegal drug schemes with politicians from Sacramento." Dr. Hilzinger recommended respondent undergo a mental health examination.

BOARD EXPERT – NATHAN LAVID, M.D., PSYCHIATRIST

9.    After receiving Dr. Hilzinger's Report, the Board asked respondent to consent to a mental health examination; respondent consented, but then withdrew her consent. On July 28, 2017, the Board issued an Order Compelling Mental Examination. On or about July 28, 2017, Investigator Moya retained Dr. Lavid, asking him to conduct a mental health examination of respondent and review materials, including Investigator Moya's Report, respondent's Controlled Substance Utilization Review and Evaluation System (CURES) report[3], urine and drug testing results, respondent's personal statement, Orchard's 805

---

[3] A CURES Report lists the controlled substances prescribed and filled for an individual.

3

Complaint, letters of support, respondent's Board interview, audio and transcript, and patient medical records.

10.      Dr. Lavid completed his Bachelor of Art in Microbiology in 1993, and his Medical Degree in 1997, at the University of Kansas, in Lawrence. Following medical school, he completed a one-year internship in the department of neurology, pediatrics, psychiatry, and human behavior, and a three-year residency in the department of psychiatry and human behavior at the University of California, Irvine. Then, Dr. Lavid completed a one-year fellowship in the department of psychiatry at the University of Southern California, in Los Angeles. He was licensed to practice in California in 1998, and is Board Certified by the American Board of Psychiatry and Neurology. Currently, Dr. Lavid is working in private practice, conducting clinical and forensic psychiatry; as a psychiatric consultant for the New Found Life rehabilitation facility in Long Beach; and as expert reviewer for the Board, since 2007. Dr. Lavid has published in journals and books and presented on multiple psychiatric topics.

11.      On August 18, 2017, Dr. Lavid conducted a mental examination of respondent, including a three hour interview and administration of the following diagnostic tests: Minnesota Multiphasic Personality Inventory, Second Edition (MMPI-2), Beck's Depression Inventory, and Beck's Anxiety Inventory. On August 25, 2017, Dr. Lavid issued a Report, opining: she has no diagnosable mental disorder under the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (DSM-V) and scored within normal limits on all diagnostic tests, but "she [respondent] presently suffers from paranoia which could substantially impair her ability to safely practice medicine." Dr. Lavid explained his conclusions, as follows:

> Dr. Rhee was evaluated for an extensive period of time (over 3 hours) and during this time, she was able to focus and concentrate and her thought processes were linear and logical. She did not appear to be responding to internal psychotic processes. Also, she did not have any type of delusional-type thinking that is found in individuals with a delusional disorder, such as grandiosity, jealousy, somatic delusions, or bizarre delusions that are clearly implausible and/or not understandable. However, her thoughts regarding the Medical Board and the hospital could be construed as paranoia, which is found in individuals who suffer from persecutory type of delusional disorder.

> [¶] . . . [¶]

> Dr. Rhee does not exhibit, and denies, most types of thoughts and behaviors outlined in the persecutory type of delusional disorder. As such, she would not meet diagnostic criteria. However, she does have some thoughts that could be construed

as paranoia, which would fit within the persecutory type of delusional disorder.

[¶] . . . [¶]

While it is difficult to make a definitive determination if her paranoia is of the severity to be delusional, I would rather defer on the conservative side in light of her being a physician and having to make decisions that have a high degree of consequences if interfered by her delusional thinking. Paranoia affects a person's ability to interpret reality correctly, which might affect her ability to practice medicine safely, especially the fact that her thoughts are directed toward medical institutions, the facility and the Medical Board.

Therefore, I would recommend that she receive psychiatric treatment and this should allow her to practice medicine safely.

*Petition*

12.     Complainant supports the Petition with a Memorandum of Points and Authorities, a declaration of Investigator Moya, with Orchard's Complaint, the Order Compelling Mental Examination, a declaration of Dr. Hilzinger with curriculum vita (CV), a declaration of Dr. Lavid with CV and Report, and declarations of Henry Starkes, M.D., April Buttacavoli, and Kristien Storne. Dr. Starkes is the Chief of Staff for the Medical Specialty Center at Orchard (Orchard Center). Ms. Buttacavoli is a Medical Assistant at the Orchard Center, and Ms. Storne is the Director of the Orchard Center. The declarations of Dr. Starkes, Ms. Buttacavoli, and Ms. Storne recount notable behavior by respondent during her tenure at Orchard.

13.     Dr. Starkes stated: he reviewed a complaint against respondent, alleging she sent patients to another doctor for treatment because she lacked sufficient experience; he listened when respondent complained to him about work colleagues yelling at her, but Dr. Starkes was present during those conversations and deemed the work colleagues to be speaking in a normal voice; he listened when respondent told him she would not perform genital examinations on male patients; he observed respondent kept a bedroll and sleeping bag under the desk in her office; and heard complaints respondent was spending nights in her office at the Orchard Center, even though she was not authorized to do so.

14.     Ms. Buttacavoli stated: she worked with respondent and was often in the examination room when respondent saw patients, and at no time did respondent touch a patient; respondent refused to shake hands with work colleagues, instead bumping elbows; and respondent told Ms. Buttacavoli she would not see male, Hispanic patients after 4 p.m. Ms. Starne stated: she reviewed several complaints against respondent, including patient and employee complaints alleging respondent did not perform an examination on them or touch them during their appointment; employee complaints alleging respondent was going through their

5

desks and mailboxes and had been observed listening at doors and sleeping in her office at the Orchard Center, even though she was instructed not to do so.

*Opposition*

15.    Respondent opposes the Petition with a declaration of Mark Zaslav, Ph.D., psychologist, and a declaration of respondent.

RESPONDENT'S EXPERT – MARK ZASLAV, PH.D.

16.    On or about October 29, 2017, respondent retained Dr. Zaslav, asking him to review materials and provide an opinion on the Report of Dr. Lavid and declaration of Dr. Hilzinger. Dr. Zaslav reviewed the following materials: the Petition for Interim Suspension, Memorandum of Points and Authorities, declaration of Investigator Moya, Orchard's 805 Complaint, Board Order Compelling Mental Examination, declaration of Dr. Hilzinger with CV, declaration of Dr. Lavid, with CV and Report, and declarations of Dr. Starkes, Ms. Buttacavoli, and Ms. Storne. Dr. Zaslav wrote a declaration, which was offered at hearing.

17.    Dr. Zaslav completed his Bachelor of Science in Psychology at Brooklyn College, New York, in 1970. He completed his Master of Science in Psychology in 1972, and his Doctorate of Philosophy in Psychology in 1975 at the University of Wisconsin, Milwaukee. Thereafter, he completed a one-year internship in Psychology at the Milwaukee County Mental Health Center. He was licensed as a Clinical Psychologist in California in 1985. Currently, Dr. Zaslav is working in private practice, conducting psychotherapy with adults, as well as, completing forensic assessments, consultation, and expert testimony in civil and administrative matters. During his career, Dr. Zaslav's has held several academic appointments, as well as Veterans Administration Medical Center positions, including Staff Psychologist, Director of Training, and Assistant Chief, Psychology Services. In addition, Dr. Zaslav has published in journals and books, and presented at seminars and institutes in the area of psychology.

18.    First, Dr. Zaslav criticized Dr. Hilzinger's assessment of respondent's mental health, noting Dr. Hilzinger is not a psychiatrist and never examined respondent. Further, Dr. Hilzinger's diagnosis of respondent with a "formal thought disorder," is not a recognized diagnosis in the DSM V. Dr. Zaslav believes Dr. Hilzinger's mental health assessments of respondent should be dismissed as not reliable. Second, Dr. Zaslav acknowledged Dr. Lavid's thorough mental health examination of respondent, resulting in no DSM V diagnosis and scores, within normal limits, on all diagnostic instruments. However, Dr. Zaslav takes exception to Dr. Lavid diagnosing respondent with "thoughts that can be construed as paranoia." Dr. Zaslav notes that the DSM V is a rigorous diagnostic tool "intended precisely to preclude misuse of vague psychiatric terms of art such as 'paranoia' (or 'formal thought disorder') by replacing them with valid clinical syndromes having concrete, carefully researched, objective diagnostic criteria." Dr. Zaslav found the opinions of Drs. Hilzinger and Lavid "invalid from a psychiatric point of view in terms of showing that Dr. Rhee presents with a mental disorder."

6

RESPONDENT

19.     Respondent is currently an independent contractor with CenseoHealth. She performs in-home health evaluations and physical examinations; in doing so, respondent makes physical contact with her patients. Respondent began work for Orchard on a limited term basis, as a locum tenens doctor, for three months. Thereafter, Orchard hired respondent on a fulltime basis. While working at Orchard, respondent became concerned that the Orchard Clinic was over-prescribing opiate medications and was engaging in questionable billing practices. She reported her concerns to Orchard management, before the peer review investigations began, and after resigning from Orchard, she reported the same to the Officer of Inspector General at the United States Department of Health and Human Services.

20.     At all times, respondent has cooperated with the Board. She complied with the Board's request for an interview. She attended the Board interview unrepresented and answered all questions. She also submitted to a mental health examination with Dr. Lavid, at the Board's behest.

*Discussion*

21.     Respondent is 48 years. She is single and lives in Gridley, California. She has been a licensed physician since May 11, 2011. She has no history of discipline with the Board.

22.     In the Petition, the Board raises two issues: (1) respondent's mental illness affecting her ability to safely practice medicine; and (2) her grossly negligent treatment of four patients and falsification of medical records for Patient JG. First, petitioner failed to prove respondent has a mental illness. Dr. Lavid has the requisite knowledge, skill, and ability to make an assessment of respondent's mental health. Dr. Lavid evaluated respondent and found no DSM V diagnosis. In addition, he found respondent tested within normal limits on three diagnostic instruments. However, Dr. Lavid also diagnoses respondent with "thoughts that can be construed as paranoia." Here, Dr. Zaslav makes clear the purpose and intent of the DSM V, as a rigorous diagnostic tool "intended precisely to preclude misuse of vague psychiatric terms of art such as 'paranoia' (or 'formal thought disorder') by replacing them with valid clinical syndromes having concrete, carefully researched, objective diagnostic criteria." Here, Dr. Zaslav's explanation is compelling. Without a DSM V diagnosis, the Board failed to establish that respondent suffers from a mental illness as contemplated by Business and Professions Code section 820 and 822.

23.     Second, petitioner has established a possibility, but not probability she will prevail at a full evidentiary hearing on the allegations regarding gross negligence and falsifying records. Petitioner relies solely on Dr. Hilzinger's three-page declaration to support the alleged violations. However, Dr. Hilzinger's declaration is conclusory and fails to provide specific evidence to support his conclusions. For example, he relies on hearsay statements to draw his conclusions regarding Patient CC (i.e. the emergency room physician could only know about the patient's appointment with respondent by recording hearsay

7

statement from the patient); he relies on a response respondent provided in her Board interview regarding not touching patients to conclude she did not touch Patients JG and JB; and he references "records and [her] investigative interviews" to conclude respondent did not perform an examination or take a history of Patient ML before administering nitroglycerin. Alone, Dr. Hilzinger's declaration is insufficient to establish to a reasonable probability of success at hearing. Notwithstanding the above, petitioner also failed to provide sufficient evidence of the likelihood of injury to the public prior to a full evidentiary hearing.

24.    Ultimately, respondent's record of more than five years of practice without any complaints, the passage of two years since the Orchard complaint, and the lack of persuasive evidence of a likelihood of injury to any patient pending a full hearing, are substantial reasons to deny the interim relief sought. Moreover, the Board allowed Orchard a year to provide documents, following receipt of the 805 Complaint; Dr. Hilzinger was not retained until May 2017; and when Dr. Hilzinger issued his Report, the Board waited until October 2017, to bring the instant Petition. Under these circumstances, it has not been demonstrated that interim relief is appropriate or necessary to protect the public health, safety or welfare.

## LEGAL CONCLUSIONS

1.    Government Code section 11529, subdivision (a) provides:

> Interim orders may be issued only if the affidavits in support of the petition show that the licensee has engaged in, or is about to engage in, acts or omissions constituting a violation of the Medical Practices Act or the appropriate practice act governing each allied health profession, or is unable to practice safely due to a mental or physical condition, and that permitting the licensee to continue to engage in the profession for which the license was issued will endanger the public health, safety, or welfare.

Government Code section 11529, subdivision (e) further provides that an interim order shall be granted where, in the exercise of discretion, the administrative law judge concludes that: (1) There is a reasonable probability that the petitioner will prevail in the underlying action, and (2) The likelihood of injury to the public in not issuing the order outweighs the likelihood of injury to the licensee in issuing the order.

2.    The standard of proof required to obtain an interim order is preponderance of the evidence. (Bus. & Prof. Code, § 494, subd. (e).)

3.    Business and Professions Code section 822 allows the licensing agency to take action against a licensee whose ability to practice safely is impaired by mental illness. The

8

licensing agency may revoke or suspend the license or place the licentiate on probation. (*Ibid.*)

4. Business and Professions Code section 2234 requires the Board to "take action against any licensee who is charged with unprofessional conduct." Unprofessional conduct includes, but is not limited to: gross negligence (Bus. & Prof. Code, § 2234, subd. (b)); and knowingly making a document, directly or indirectly related to the practice of medicine, which falsely represents the existence or nonexistence of a state of facts. (Bus. & Prof. Code, § 2261.)

5. No cause exists for issuing an interim suspension order under Government Code section 11529, because petitioner failed to prove, by a preponderance of the evidence, respondent has a mental illness. (Factual Findings 9 through 11, 15 through 17, and 20 through 23.)

6. No cause exists for issuing an interim suspension order under Government Code section 11529, because petitioner failed to prove, by a preponderance of the evidence, respondent acted with gross negligence and/or falsified medical records. (Factual Findings 4 through 8, 17 through 19, and 20 through 23). Petitioner has also failed to establish that permitting respondent to continue to engage in the practice of medicine will endanger the public health, safety or welfare until a full evidentiary hearing can be conducted.

7. Considering the above, in this case, the likelihood of injury to the public in not issuing the order does not outweigh the likelihood of injury to respondent in issuing the order.

## ORDER

The Petition for interim suspension order against respondent Hanna Queen Rhee, MD, Physician and Surgeon Certificate No. A 116932, is DENIED.

DATED: November 9, 2017

DocuSigned by:

*Erin L. Koch Goodman*

6D644509A8FF4C5...

ERIN R. KOCH-GOODMAN
Administrative Law Judge
Office of Administrative Hearings

9

EXHIBIT    C

1    XAVIER BECERRA
     Attorney General of California
2    ALEXANDRA M. ALVAREZ
     Supervising Deputy Attorney General
3    MEGAN R. O'CARROLL
     Deputy Attorney General
4    State Bar No. 215479
       1300 I Street, Suite 125
5      P.O. Box 944255
       Sacramento, CA 94244-2550
6      Telephone: (916) 210-7543
       Facsimile: (916) 327-2247
7
     *Attorneys for Complainant*
8

9

10

11                              **BEFORE THE**
                    **MEDICAL BOARD OF CALIFORNIA**
12               **DEPARTMENT OF CONSUMER AFFAIRS**
                        **STATE OF CALIFORNIA**
13

| In the Matter of the Interim Suspension Order Against: | OAH No. _____<br>Case No. 800-2015-018187 |
|---|---|
| **HANNA QUEEN RHEE, M.D.**<br>**912 Hazel St.**<br>**Gridley, CA 95948-2114**<br>**Physician's and Surgeon's Certificate No.**<br>**No. A 116932** | **PETITION FOR INTERIM SUSPENSION ORDER**<br><br>**[Gov. Code Section 11529]** |
| Respondent. | **Date: October 30, 2017**<br>**Time: 1:30 p.m.**<br>**Place: Office of Administrative Hearings**<br>**Sacramento General Jurisdiction**<br>**2349 Gateway Oaks Drive, Suite 200**<br>**Sacramento, CA** |

23

24        Petitioner, Kimberly Kirchmeyer, Executive Director ("Petitioner") of the Medical Board

25   of California, State of California ("Board"), makes and files, by and through her attorney Xavier

26   Becerra, Attorney General of the State of California, by Megan R. O'Carroll, Deputy Attorney

27   General, this petition for an interim suspension order of the Physician's and Surgeon's Certificate

28

                                              1

No. A 116932, issued to Hanna Queen Rhee, M.D. ("Respondent"), and by said petition alleges as follows:

## INTRODUCTION

1.     Complainant brings this Petition because permitting Respondent to continue practicing medicine at this time constitutes a danger to the public. The likelihood of injury to the public in not issuing the order outweighs any potential injury to Respondent should the order issue.

2.     Respondent has committed acts of gross negligence, repeated negligent acts, and improper recordkeeping with numerous patients over a short period of time. More concerning still, experts who have reviewed her care and her conduct have concluded that her poor care is due to a mental condition of disordered thinking and paranoia that renders her incapable of providing safe medical care to the public. Therefore, The Board brings this action pursuant to Government Code section 11529 to urge the suspension of Respondent's ability to practice medicine pending the outcome of a hearing on the merits of the serious allegations of gross negligence made against her as well as the allegation that she presents a danger to the public due to a mental health condition. This petition is made in the interest of justice on the grounds that Respondent, if allowed to continue to practice without restriction, poses a substantial danger to the public health, safety, and welfare.

3.     This motion is based upon this Petition; the attached Memorandum of Points and Authorities; the declarations of Medical Board of California Investigator Roberto Moya, with attachments, Reinhardt Hilzinger, M.D., Nathan Lavid, M.D., Henry Starkes, M.D., Director Kirsten Storne, Medical Assistant April Buttacavoli, and Deputy Attorney General Megan R. O'Carroll; and any other such oral or documentary evidence as may be presented at the hearing on this petition, as well as any argument presented at the hearing.

## PARTIES

4.     Petitioner is the Executive Director of the Medical Board of California and makes and files this petition solely in her official capacity.

2

1    5.    The Board is the state agency charged with administering and enforcing the

2    statutes and regulations governing the practice of medicine in the State of California, viz.,

3    Chapter 5, Article 1, of the Business and Professions Code commencing with section 2000 et.

4    seq., commonly known as the Medical Practice Act.  This includes the regulation of licensees

5    pursuant to Business and Profession Code sections 820 and 822.  Petitioner has been authorized

6    to make this petition on behalf of the Board and in the furtherance of the Board's duties.

7    6.    On or about May 11, 2011, Physician's and Surgeon's Certificate No. A 116932,

8    was issued by the Board to Respondent.  At all times relevant to this proceeding, the license has

9    been in full force and effect and will expire, unless renewed, on August 31, 2018.  (Attached as

10   Exhibit G and incorporated by reference, as if set forth in full, is a true and correct copy of the

11   Certificate of Licensure.)

12                                    **JURISDICTION**

13   7.    Government Code section 11529(a) provides the authority for an administrative law

14   judge of the Medical Quality Hearing Panel to issue an interim order suspending the medical

15   license of a physician.  The order may be issued if affidavits in support of the petition for an

16   interim suspension order show that the physician has engaged in, or is about to engage in, acts

17   constituting a violation of the Medical Practice Act or other relevant practice acts, or that the

18   physician is unable to practice safely due to a mental or physical condition, and that permitting

19   the physician to continue to engage in the practice of medicine will endanger the public health,

20   safety, or welfare.

21   8.    An order suspending a physician's license pursuant to Government Code section

22   11529(a) may generally only be issued after a hearing conducted with at least 15-days prior notice

23   to the licensee.

24   9.    Section 820 of the Code states:

25        Whenever it appears that any person holding a license, certificate or
          permit under this division or under any initiative act referred to in this division may
26        be unable to practice his or her profession safely because the licentiate's ability to
          practice is impaired due to mental illness, or physical illness affecting competency,
27        the licensing agency may order the licentiate to be examined by one or more
          physicians and surgeons or psychologists designated by the agency.  The report of
28

                                          3

1    the examiners shall be made available to the licentiate and may be received as direct
     evidence in proceedings conducted pursuant to Section 822.

2
3    10.    Section 822 of the Code states:

4            If a licensing agency determines that its licentiate's ability to practice
5    his or her profession safely is impaired because the licentiate is mentally ill, or
     physically ill affecting competency, the licensing agency may take action by any
6    one of the following methods:
             (a) Revoking the licentiate's certificate or license.
7            (b) Suspending the licentiate's right to practice.
             (c) Placing the licentiate on probation.
8            (d) Taking such other action in relation to the licentiate as the licensing
     agency in its discretion deems proper.
9            ...

10   11.    Section 2234 of the Code, states:

11           "The board shall take action against any licensee who is charged with
12   unprofessional conduct. In addition to other provisions of this article, unprofessional
     conduct includes, but is not limited to, the following:
13
             "(a) Violating or attempting to violate, directly or indirectly, assisting in or
14   abetting the violation of, or conspiring to violate any provision of this chapter.

15           "(b) Gross negligence.

16           "(c) Repeated negligent acts. To be repeated, there must be two or more
17   negligent acts or omissions. An initial negligent act or omission followed by a
     separate and distinct departure from the applicable standard of care shall constitute
18   repeated negligent acts.

19           "(1) An initial negligent diagnosis followed by an act or omission medically
20   appropriate for that negligent diagnosis of the patient shall constitute a single
     negligent act.
21
             "(2) When the standard of care requires a change in the diagnosis, act, or
22   omission that constitutes the negligent act described in paragraph (1), including, but
     not limited to, a reevaluation of the diagnosis or a change in treatment, and the
23   licensee's conduct departs from the applicable standard of care, each departure
     constitutes a separate and distinct breach of the standard of care.
24
             "(d) Incompetence.
25
26           "(e) The commission of any act involving dishonesty or corruption which is
     substantially related to the qualifications, functions, or duties of a physician and
27   surgeon.

28

                                            4

1        "(f) Any action or conduct which would have warranted the denial of a certificate.

2        "(g) The practice of medicine from this state into another state or country
3    without meeting the legal requirements of that state or country for the practice of medicine. Section 2314 shall not apply to this subdivision. This subdivision shall

4
5    become operative upon the implementation of the proposed registration program described in Section 2052.5.

6        "(h) The repeated failure by a certificate holder, in the absence of good cause,
7    to attend and participate in an interview by the board. This subdivision shall only apply to a certificate holder who is the subject of an investigation by the board."

8        12.    Section 2261 of the Code states: "Knowingly making or signing any certificate or

9    other document directly or indirectly related to the practice of medicine or podiatry which falsely

10   represents the existence or nonexistence of a state of facts, constitutes unprofessional conduct."

11       13.    The evidence submitted in support of this petition that permitting the licensee to

12   continue to engage in the medical profession will endanger the public health, safety or welfare

13   based upon her mental state and the inappropriate documentation of and care of the patients

14   discussed in this petition. · If Respondent is permitted to continue to engage in the practice of

15   medicine unchecked she will endanger the public health, safety or welfare. (Gov. Code, § 11529,

16   subd. (a).) Accordingly, the requested interim order of suspension should be issued forthwith

17   immediately suspending Respondent's Physician's and Surgeon's Certificate No. A 116932.

18
19   ## FIRST CAUSE FOR INTERIM SUSPENSION

20   ### (Bus. & Prof. Code section 822, Mental Illness Affecting Competency)

21       14.    Respondent is unable to practice medicine safely due to a mental and/or physical

22   condition under Government Code section 11529, subdivision (a), and, further, is subject to

23   action under Business and Professions Code section 822. The facts are as follows:

24       15.    Respondent began working as a locum tenens physician at the Orchard Hospital

25   Medical Specialty Center in Gridley, California in or about March of 2015. (Ex. A, Moya Decl. ¶

26   6.) During May of 2015, Orchard Hospital Medical Specialty Center signed a three-year

27   employment contract with Respondent, but she resigned during investigation after only five

28   months. (*Ibid.*) During the five months that she was working at the Medical Specialty Center,

1  there were a number of patient and staff complaints regarding her care and treatment of patients.

2  (Ex. A, Moya Decl. ¶ 6; Ex. F, Storne Decl. ¶ 2.)

3      16.    On or about November 17, 2015, the Medical Board of California (Board) received a

4  report under Business and Professions Code section 805 indicating that Respondent resigned her

5  privileges at Orchard Hospital Medical Specialty Center in Gridley, California while an

6  investigation was pending, and the resignation was effective September 17, 2015. (Ex. A, Moya

7  Decl. ¶ 3, Attach. 1.) The investigation was due to a number of patients and staff members

8  registering complaints about Respondent's behavior and her clinical competence. (*Ibid.*)

9      17.    On or about January 7, 2016, the Board received a letter from one of Respondent's

10  former coworkers, a physician. (Ex. A, Moya Decl. ¶ 4.) The letter stated that he had left the

11  Medical Specialty Center in Gridley, due in part to harassment from Respondent. (*Ibid.*) He was

12  writing to ensure that the hospital had reported her conduct to the Board and that the Board would

13  be investigating her. He reported his belief that Respondent is an incompetent physician with

14  possible psychiatric problems. (*Ibid.*)

15      18.    The Board opened an investigation into the facts and circumstances surrounding

16  Respondent's resignation while under investigation by Orchard Hospital Medical Specialty

17  Center. (Ex. A, Moya Decl. ¶ 3.) Roberto Moya was the investigator assigned to the case.

18  Between February and December of 2016, Investigator Moya gathered documents from Orchard

19  Hospital regarding Respondent, including patient complaints, medical records, peer review

20  documents and incident reports. (Ex. A, Moya Decl. ¶¶ 5-7.) On or about January 3, 2017,

21  Investigator Moya interviewed Respondent about the events surrounding her resignation from

22  Orchard Hospital Medical Specialty Center. (Ex. A, Moya Decl. ¶ 8.) Following that interview,

23  during January, February, and March of 2016, Investigator Moya interviewed several witnesses

24  and patients about their interactions with Respondent at Orchard Hospital Medical Specialty

25  Center. (Ex. A, Moya Decl. ¶¶ 5-7.)

26      19.    During his interviews with staff at the Medical Specialty Center, Investigator Moya

27  spoke with the Director of the Medical Specialty Clinic, and several nurses and medical assistants

28  who worked with Respondent. Several of these witnesses indicated that Respondent refused to

6

1   shake hands, and instead did an "elbow bump," due to being concerned about germs. A Medical
2   Assistant who had worked with Respondent indicated that she never once observed Respondent to
3   ever touch a patient. She further indicated that Respondent told the Medical Assistant that she
4   would not see male, Hispanic patients after 4:00 p.m. The administrative staff at Orchard
5   Hospital Medical Specialty Center were also receiving information that Respondent was not
6   touching patients, because several patients complained that she would not touch or examine them
7   when they presented for appointments. (Ex. A, Moya Decl. ¶¶ 6-7.)

8       20.    Other physicians and nurse practitioners at the Medical Specialty Clinic reported that
9   Respondent was referring seriously ill patients to them without properly examining or treating
10  them for serious conditions requiring immediate medical attention. (Ex. D, Starkes, Decl. ¶ 2.)
11  Some specific patient cases involving these allegations are addressed in greater detail below in
12  this Petition.

13      21.    With regard to the issues involving Respondent's bizarre behaviors with other staff,
14  the Chief of Staff reported that Respondent often accused him and others of yelling at her despite
15  everyone using a normal tone and volume of voice. (Ex. D, Starkes, Decl. ¶ 4.) He confirmed
16  that Respondent at one point told him that she would not perform genital examinations on male
17  patients. (Ex. D, Starkes, Decl. ¶ 5.) Finally, the Chief of Staff reported that Respondent had
18  been spending nights in the clinic, even after being asked not to be present unless she was
19  scheduled to work. (Ex. D, Starkes, Decl. ¶ 6.) He noted that she kept a bedroll and sleeping bag
20  under her desk. (*Ibid.*)

21      22.    The Director of the Medical Specialty Center stated that she received complaints from
22  several staff members that they caught Respondent going through their mail and listening
23  surreptitiously at doors to conversations others were having. (Ex. F, Storne, Decl. ¶ 4.) She
24  explained that when Respondent was confronted about this behavior she did not deny it. (Ex. F,
25  Storne, Decl. ¶ 4.) Respondent was counseled and issued a formal warning letter on or about
26  August 5, 2015, for listening at doors to private conversations, going through other individuals'
27  desks and mailboxes, and accessing medical records of individuals who were not her patients in
28  violation of HIPPA protections. (*Ibid.*) The Director confirmed that Respondent indicated that

7

1   she would not perform genital examinations on patients. (Ex. F, Storne, Decl. ¶ 3.) She

2   understood Respondent to be referring to male patients. (*Ibid.*) She witnessed Respondent tell

3   the Chief Executive Officer of Orchard Hospital that he was "sick" if he expected her to perform

4   genital examinations on male patients. (*Ibid.*) Respondent never reported that any male patient

5   behaved in a sexual manner during any appointment with her. (*Ibid.*)

6        23.   The Director of the Center recounted an event that occurred on or about Saturday,

7   August 29, 2015, approximately two weeks after the Chief of Staff had instructed Respondent not

8   to be present at the facility when she was not scheduled to work. (Ex. F, Storne, Decl. ¶ 5.)

9   Respondent spoke to the Director by telephone reporting that she felt unsafe because another

10   physician present was threatening her. (*Ibid.*) The Director explained that the physician was

11   authorized to be at the facility that day, and Respondent was not authorized to be present, and

12   Respondent should leave immediately. (*Ibid.*) The Director required Respondent to verbalize

13   that she was leaving the facility. (*Ibid.*) Respondent did so. (*Ibid.*) The Director then proceeded

14   to the facility, without warning Respondent that she was going there. (*Ibid.*) When the Director

15   arrived approximately 20 minutes later, Respondent was still present in the building, and claimed

16   to be barricaded in her office for protection. (*Ibid.*) The Director saw Respondent off the

17   premises. (*Ibid.*)

18        24.   A Medical Assistant who worked with Respondent the entire time Respondent was at

19   the Center reported also that Respondent would not shake hands with anyone. (Ex. E,

20   Buttacovoli Decl., ¶ 2.) Instead, she told everyone that she would do an "elbow bump" as a

21   greeting to prevent the spread of germs. (*Ibid.*) This Medical Assistant never observed

22   Respondent touch a patient or perform a physical examination of a patient during the entire time

23   she worked at the Center. (*Ibid.*) Respondent told the Medical Assistant that she would not see

24   any male, Hispanic patients after 4:00 p.m. (Ex. E, Buttacovoli Decl., ¶ 2.) The Medical

25   Assistant did not know why Respondent made this stipulation. (*Ibid.*)

26        25.   Based on the information in the records and statements of witnesses, Investigator

27   Moya requested Respondent submit to a voluntary mental examination by a Board-appointed

28   psychiatrist. (Ex. A, Moya Decl. ¶ 9.) On or about February 2, 2017, Respondent agreed to

1    undergo a mental examination. (*Ibid.*) When Investigator Moya sent Respondent information

2    about attending the appointment for a mental examination, however, Respondent withdrew her

3    consent to undergo the mental examination voluntarily. (*Ibid.*)

4         26. On or about May 17, 2017, Investigator Moya sent the records and reports he

5    prepared concerning Respondent's investigation and resignation from Orchard Medical Specialty

6    Center to a Board-appointed expert, Dr. Reinhardt Hilzinger. (Ex. A, Moya Decl. ¶ 10.) Dr.

7    Hilzinger reviewed the summary of witness statements, the medical records of patients who had

8    complained about Respondent's care, and the transcript and audio recording of Respondent's

9    interview with Board investigators, among other documents. (Ex. B, Hilzinger Decl. ¶ 2.) Dr.

10   Hilzinger opined that Respondent violated the standard of care in multiple ways in her treatment

11   of each of the nine patient records that he had been sent to review including committing multiple

12   extreme departures in her assessment and treatment of the patients. (*Ibid.*) He also noted that his

13   review of Respondent's care of patients, her behavior in the clinic, and her statements in the

14   interview with the Board displayed evidence of a formal thought disorder that impairs her ability

15   to practice medicine safely. (Ex. B, Hilzinger Decl. ¶ 3.) He recommended she undergo a full

16   psychiatric evaluation. (*Ibid.*)

17        27. Based on Respondent's withdrawal of consent to undergo a voluntary mental

18   examination, and the opinion of Dr. Hilzinger that Respondent may have a psychiatric condition

19   affecting her ability to practice medicine safely, Complainant filed a Petition to Compel

20   Respondent to undergo psychiatric evaluation under Business and Professions Code section 820

21   on or about July 17, 2017. (Ex. A, Moya Decl. ¶ 12.) On or about July 28, 2017, the Board

22   issued an order compelling Respondent to undergo a mental evaluation. (Ex. A, Moya Decl. ¶ 13,

23   Attach. 2.)

24        28.   Nathan Lavid, M.D., is a Board-certified psychiatrist. (Ex. C, Lavid Declaration ¶ 1.)

25   On or about August 18, 2017, pursuant to the Board's order compelling a mental examination,

26   Respondent was evaluated by Dr. Lavid. (Ex. C, Lavid Decl. ¶ 2.) Dr. Lavid reviewed the

27   investigative materials provided by Investigator Moya, and conducted a three-hour examination

28   of Respondent. (*Ibid.*) On or about August 25, 2017, Dr. Lavid provided the Board with a report

9

1  of his evaluation, finding that Respondent presented with thoughts reflective of an individual

2  suffering from paranoia. (Ex. C, Lavid Declaration, Attach 2.)  While he found Respondent did

3  not exhibit, and denies, thoughts and behaviors outlined in a persecutory delusional disorder, she

4  nevertheless has thoughts that can be construed as paranoia, which fit within the persecutory

5  delusional disorder. (Ex. C, Lavid Decl. ¶¶ 3-4; Attach 2.)  Dr. Lavid noted that Respondent's

6  social, educational, and work history show that she remains outside of societal norms. (*Ibid.*)  For

7  example, he pointed out that she took eight years to obtain a Bachelor's degree, and an additional

8  year to finish medical school, she did not participate in the school's match program, instead doing

9  research, then beginning and failing to complete two residency programs before working as a

10  general practitioner. (*Ibid.*)  He noted that at times she lived in her office to save money, even to

11  the extent of not having a private shower available. (*Ibid.*)  While Dr. Lavid acknowledged that

12  these aberrations from standard medical education and training may be due to personality traits,

13  they are also potentially signs of paranoid delusional disorder. (*Ibid.*)  Given that many of

14  Respondent's paranoid delusional thoughts are attributed to medical institutions, and that she

15  would be required to accurately interpret reality in the medical field in order to practice medicine

16  safely, Dr. Lavid opines that Respondent is not able to practice medicine safely at this time due to

17  the paranoia. (*Ibid.*)

18    29.    Dr. Lavid's review of the materials in this case, and his evaluation of Respondent

19  caused him to conclude that Respondent presently suffers from paranoia which could

20  substantially impair her ability to safely practice medicine and that the public is in danger if the

21  Respondent is permitted to continue to practice medicine. (Ex. C. Lavid Decl. ¶¶ 3-4; Attach 2.)

22  Dr. Hilzinger reviewed Respondent's patient care, but was not provided all the information

23  concerning Respondent's bizarre behavior in the clinic. (Ex. B, Hilzinger Decl. ¶ 4.)

24  Nonetheless, as an internist, his review of Respondent's patient care also caused him concern that

25  allowing Respondent to continue to practice medicine presents a risk of harm to the public, and

26  had he been aware of these additional facts, he would have had even greater concern for the

27  safety of the public who may be treated by Respondent. (*Ibid.*)

28  / / /

(HANNA QUEEN RHEE, M.D.) Petition for Interim Order of Suspension

1    30.    Respondent's status as described above establishes cause pursuant to Government

2  Code section 11529 to suspend Respondent's Physician's and Surgeon's Certificate.

3                    **SECOND CAUSE FOR INTERIM SUSPENSION ORDER**

4                    **(Bus. & Prof. Code section 2234, Gross Negligence)**

5    31.    Respondent is subject to disciplinary action under section 2234, subdivision (b) of the

6  Code in that he committed acts of gross negligence, the circumstances of which are as follows:

7        **Patient J.B.**

8    32.    Patient J.B. was a 50-year-old man who presented to the Medical Specialty Center in

9  Gridley on or about July 5, 2015, with a history of genital pain for the previous three days.

10  Respondent charted J.B.'s present complaint to be right scrotal pain, with no prior event, that

11  came on suddenly.  She noted he had pain of 4/10, and denied chest pain, dizziness,

12  lightheadedness, stomach upset, dysuria, fever or chills, and nausea.

13    33.    Respondent charted a review of systems with no positive findings.  The examination

14  note contained a template list of examination with normal findings for General, Cardiac, Lungs,

15  and Abdominal systems.  Below these is an examination note with a heading "genital" that states,

16  "no rash, hernia unable elicit pain."  When discussing her care of J.B. with the Board's

17  investigators, Respondent initially reinforced that she does not do genital examinations, and

18  explained that she had the interpreter present to explain this to J.B.  When the investigator asked

19  her to explain what she meant in her chart note about not being able to elicit pain, however,

20  Respondent stated that she palpated J.B.'s testicle.  Upon further inquiry, she stated that she had

21  no specific recollection of the patient or whether she palpated the testicle.  She further confirmed

22  that she does not perform physical palpation of men to check for inguinal hernias, and therefore,

23  she did not perform an internal palpation of J.B.'s inguinal canal to check for a hernia in that

24  fashion.  Nonetheless, Respondent charted in J.B.'s medical record under "genital" that he had no

25  rash or hernia, and that she was unable to elicit pain.

26    34.    Respondent did not order any cultures or urinalysis for J.B.  She did not order a

27  scrotal ultrasound.  Respondent's assessment of J.B. was that of unspecified disorder of male

28  genital organs.  She prescribed Motrin, and directed him to follow up with his primary care

11

1  physician. She did not indicate any timeframe for J.B. to follow up with his primary care

2  physician. Although she reported that J.B.'s complaint of scrotal pain was not reproducible

3  during her examination, J.B. was seen by another physician three days later who reported that his

4  testicle was very painful during his appointment with Respondent.

5  **Patient C.C.**

6      35.    Patient C.C. was a 63-year old patient when she saw Respondent on or about July 21,

7  2015 with a complaint of left hand pain. She reported she woke up with pain at 9/10 on her left

8  hand. Respondent recorded that she performed an examination of C.C. Respondent wrote under

9  "assessment" that C.C. had rash and other nonspecific skin eruption, personal history of tobacco

10  use, and dehydration. Under "plan" Respondent stated that the rash appeared consistent with

11  scalding or toxic exposure and referred her to the Emergency Room, but also apparently issued a

12  referral to a dermatologist.

13      36.    C.C. was seen that same day at the Emergency Room. The Emergency Room

14  physician's examination recorded that C.C. had a rash on the left hand and palm, with induration,

15  tenderness, thickening, inflammation and crusting. He diagnosed her with contact dermatitis and

16  cellulitis of the left hand. He prescribed Triamcinolone 0.5% cream to be applied to the hand

17  three times daily and to return in two days if the symptoms had not improved.

18      37.    Patient C.C. complained that Respondent did not unwrap the bandages on her hand to

19  examine her before referring her to the Emergency Room or to dermatology. Respondent stated

20  that she believed Patient C.C. had dementia with psychotic features, and had been "on the fence"

21  about diagnosing her with these mental conditions during her care of C.C.

22      38.    J.G. was a 76-year old woman, who saw respondent on or about July 28, 2015,

23  complaining of burning with urination, although she could not urinate at the time of the visit.

24  Respondent charted ten items in her assessment, including a history of breast and lung cancers,

25  coronary artery disease, and ulcerative colitis. Respondent's charting under the assessment and

26  review of systems have no information about any of the assessed conditions, except the dysuria.

27  Respondent did not initially chart a physical examination of J.G. in the medical record, which she

28  signed electronically on or about August 3, 2015. However, after J.G.'s complaint was brought to

1   Respondent's attention, Respondent added an addendum to J.G.'s record, on or about September

2   2, 2015, which stated, "notified of HER charting error.  CORRECTION: gen a n o x3 and cardio

3   RRR no MGR lunch unremark sans Rt M.L psych pleasnt coop."  When Board investigators

4   asked Respondent about J.G.'s complaint that Respondent never examined her, Respondent

5   responded that she believed J.G. was a cocaine user.

6   **Patient M.L.**

7       39.    M.L. was a 54-year old man who had been having syncopal episodes on or about

8   August 7, 2015, which caused his wife to call and make an appointment for him with his primary

9   care physician, Dr. B.  His wife reported that as she was bringing M.L. to the clinic for that

10  appointment he began having another syncopal episode in the parking lot.  Respondent observed

11  this and rushed out to the parking lot.  She determined that he was having a cardiac event based

12  on her observations of him, and provided him with nitroglycerin which she administered

13  sublingually.

14      40.    Respondent stated that she did not make any chart notes concerning her encounter

15  with patient M.L. because it occurred outside the clinic, in the parking lot.  M.L.'s wife reported

16  that Respondent took no history and performed no examination before administering the

17  nitroglycerin to her husband.  Respondent was taken to the Emergency Room for treatment.  At

18  no time during the event did M.L. experience or report having any chest pain.

19      41.    At the Emergency Room, M.L. was examined, and was determined to have bacterial

20  pneumonia and dehydration.  He was given antibiotics and kept in the hospital overnight for

21  observation.  The nurse who recorded the incident with Respondent reported that Respondent told

22  her M.L.'s blood pressure was 74 over 34.  Respondent denied this stating that it was not that

23  low.  However, nursing notes of M.L.'s treatment in the Emergency Room show that his blood

24  pressure remained extremely low after he was taken to the Emergency Room.  It was recorded at

25  70/40 upon admission.  Approximately two and half hours later, it was recorded to be 87/51.  The

26  nurse who reported the event involving Respondent's care of M.L. noted that his blood pressure

27  remained in the range of 60's over 30's for approximately 90 minutes after the initial encounter

28  with Respondent.  He was observed closely for symptomatic hypotension and given intravenous

13

1  fluids. Over the next hour it rose to 80's over 40's, and eventually returned to the range of 90-
2  106 over 50-60 diastolic. She recorded that when M.L. reached this level, his skin dried and he
3  was no longer feeling so lightheaded.

4      42.   Dr. Hilzinger, after reviewing Respondent's care of patients J.B., J.G., M.L., and
5  C.C., among other patients, opined that Respondent's patient care in these cases represents an
6  extreme departure from the standard of care. In addition, after reviewing her care and her
7  interview with the Board, Dr. Hilzinger concluded Respondent has a thought disorder that is
8  affecting her ability to safely practice medicine. (Ex. B, Hilzinger Decl. ¶¶ 5-6.)

9      43.   Paragraphs 14-30 are incorporated here by reference.

10      44.   Respondent's conduct, as described above, constitutes gross negligence in violation
11  of Business and Professions Code sections 2234 of the Medical Practices Act, and presents such
12  an imminent danger to the safety of patients that it establishes cause pursuant to Government
13  Code section 11529 to suspend Respondent's Physician's and Surgeon's Certificate.

14                            **THIRD CAUSE FOR INTERIM SUSPENSION ORDER**

15                               **(Falsifying Medical Records)**

16      45.   Respondent is subject to disciplinary action under section 2261 of the Code in that
17  she recorded a physical examination of J.G. that she did not perform.

18      46.   Paragraphs 14 through 30, and 31-44, above, repeated here as if fully set forth.

19      47.   Respondent's conduct, as described above, constitutes falsification of medical records
20  in violation of Business and Professions Code sections 2261 of the Medical Practices Act, and
21  presents such an imminent danger to the safety of patients that it establishes cause pursuant to
22  Government Code section 11529 to suspend Respondent's Physician's and Surgeon's Certificate.

23  ///
24  ///
25  ///
26
27
28

                             14

1

## PRAYER

2    **WHEREFORE**, Petitioner prays that the Office of Administrative Hearings issue interim

3    order suspending Respondent's medical license until such time as this matter can be heard on

4    notice pursuant to the provisions of California Government Code section 11529(c).  Petitioner

5    also prays that the Office of Administrative Hearings shall order such other and further relief as

6    may be deemed appropriate to protect the public health, safety, and welfare.

7    Dated:  October 13, 2017                              Respectfully Submitted,

8                                                          XAVIER BECERRA
                                                           Attorney General of California
9                                                          ALEXANDRA M. ALVAREZ
                                                           Supervising Deputy Attorney General
10

11                                                         *Megan R. O'Carroll*

12                                                         MEGAN R. O'CARROLL
                                                           Deputy Attorney General
13                                                         *Attorneys for Petitioner*

14

15

16    SA2017305875/33045291.doc

17

18

19

20

21

22

23

24

25

26

27

28

15

EXHIBIT   D

# Nathan E. Lavid, MD

Curriculum Vitae

| Clinical Office | Mailing Address |
|---|---|
| (All Appointments) | (All Correspondence) |
| 834. E. 4th Street, Suite F | 65 Pine Avenue |
| Long Beach, CA 90802 | Long Beach, CA 90802 |

Tel: (562) 912-4646
Fax: (562) 912-4647
Email: nlavid@nathanlavidmd.com
www.nathanlavidmd.com

## EDUCATION

**University of Southern California:** Los Angeles, California
*Forensic Fellow* – USC Institute of Psychiatry, Law & Behavioral Science
Department of Psychiatry July 2001 – June 2002

**University of California, Irvine:** Orange, California
*Resident* – Department of Psychiatry and Human Behavior July 1998 – June 2001
*Intern* – Departments of Medicine, Neurology, Pediatrics, and Psychiatry and
Human Behavior July 1997 – June 1998

**University of Kansas School of Medicine:** Kansas City, Kansas
M.D. August 1993 – May 1997

**University of Kansas:** Lawrence, Kansas
B.A. August 1988 – May 1993
Major: Microbiology

## LICENSURE

California – A67055
New York – 220451
DEA

## CERTIFICATION

American Board of Psychiatry and Neurology – January 2003, with continued
Maintenance of Certification

USMLE:
    Step 1 – June 1995
    Step 2 – August 1996
    Step 3 – May 1998

Curriculum Vitae                Nathan E. Lavid, M.D.                                2

## CURRENT OCCUPATION

*Private Practice.* Clinical and Forensic Psychiatry. General psychiatric practice based in Long Beach, CA. Forensic psychiatric practice primarily serving Southern California. July 2002 – present.

*Psychiatric Consultant.* Provide psychiatric consultations and treatment for patients receiving care at New Found Life, a nationally renowned residential facility for patients recovering from addiction located in Long Beach, California. February 2005 – present.

*Expert Reviewer.* Medical Board of California. March 2007 – present.

*Psychiatric Consultant.* Psychotropic Medication Consultation Pilot Project. Judicial Council of California. April 2007 – present.

## PROFESSIONAL EXPERIENCE

### Academic Appointments and Administrative Psychiatry

*Review Editor.* Frontiers in Forensic Psychiatry. March 2011 – June 2017.

*Dsm-5 Field Trials Collaborating Physician Investigator.* American Psychiatric Association. March 2011 – January 2012.

*Clinical Instructor.* University of Southern California School of Medicine, Department of Psychiatry, Institute of Psychiatry, Law and Behavioral Science, Los Angeles, CA. July 2001 – June 2002. Supervision and teaching of residents and medical students performing forensic evaluation and testimony.

*Resident Clinical Forensic Instructor.* University of California, Irvine College of Medicine, Department of Psychiatry and Human Behavior, Orange, CA. July 2000 – July 2001. Supervision and teaching of junior psychiatry residents and medical students performing and learning forensic psychiatry.

*Resident Chairman of The Quality Assurance and Maintenance Committee* University of California, Irvine College of Medicine, Department of Psychiatry and Human Behavior Orange, CA. July 1999 – July 2000. Management of physician and patient concerns at the UCI Neuropsychiatric clinic.

*Co-Chairman of Morning Report.* University of California, Irvine College of Medicine, Department of Psychiatry and Human Behavior Orange, CA. July 1999 – July 2000. Supervision of on-call patient sign out and teaching of junior psychiatry and neurology residents.

**Ex C - 006**

Curriculum Vitae                 Nathan E. Lavid, M.D.                                3

## Clinical Psychiatry

*Consulting Psychiatrist.* The Center for Discovery and Adolescent Change.
Downey, Lakewood, and Long Beach, CA. May 2002 – November 2003.
Evaluation and treatment of adolescents with eating disorders and addictions in a
residential treatment setting.

*Staff Child and Adolescent Psychiatrist.* Children's Outpatient Clinic, Pacific
Clinics, Orange and Santa Ana, CA. October 2000 – July 2001. Evaluation and
treatment of mental illness in children and adolescents in Orange County, CA.

*Staff Child and Adolescent Psychiatrist.* Children's Day Treatment and
Assessment Center. Pacific Clinics, Santa Ana, CA. October 2000 – February
2001. Evaluation and treatment of mental illness in children and adolescents in
Orange County, CA.

*Staff Psychiatrist.* Pacific Clinics, Orange, CA. August 2000 – October 2000.
Evaluation and treatment of severe and chronic mental illness in adults in Orange
County, CA.

## Forensic Psychiatry

*Social Security Panel Psychiatrist.* Orange and Los Angeles Counties, CA.
Consultative psychiatric examinations assessing the impact of a mental
impairment on the claimant's functioning for the Departments of Social Services,
Rehabilitation, and Employment Development. August 2000 – September 2010.

*Consulting Psychiatrist.* Department of the Coroner, Los Angeles, CA. July
2001 – June 2002. Forensic psychiatric autopsy investigation for the Forensic
Medical Division.

*Consulting Psychiatrist.* Department of Mental Health of Los Angeles County,
Los Angeles, CA. July 2001 – June 2002. Evaluation and treatment of
incarcerated mentally ill adult outpatients at the Inmate Reception Center, Twin
Towers Correctional Facility.

*Consulting Psychiatrist.* Los Angeles County Superior Court D95, Los Angeles,
CA. July 2001 – June 2002. Evaluation of criminal and mentally ill defendants on
the day of their hearing providing recommendations and testimony to the court on
issues including competency to stand trial, drug addiction, LPS conservatorship,
and restoration of competency and firearms.

*Forensic Psychiatrist.* LAC + USC Medical Center Ingleside Campus,
Rosemead, CA. July 2001 – June 2002. Civil commitment evaluations and

Curriculum Vitae                Nathan E. Lavid, M.D.                              4

testimony as an expert witness for mentally ill inpatients at Los Angeles County
Superior Court D95.

*Group Therapy Leader*. Department of Health Services, LAC + USC Medical
Center, Los Angeles, CA. July 2001 – 2002. Evaluation and treatment of sex
offenders.

*Member, Los Angeles County Superior Court Expert Panel of Psychiatrists*. LAC
+ USC Medical Center, Los Angeles, CA. July 2001 – June 2002. 730 E.C.
evaluations and testimony including competency to stand trial and for decision-
making, civil commitment, dangerousness, diminished intent, disability, domestic
relations, drug addiction, fitness, harassment, insanity, personal injury, placement,
psychiatric evaluation for treatment, relationship between parent and child,
restoration of competency, sex offender evaluations, and trial strategy.

*Resident Psychiatrist*. University of California, Irvine. Orange, CA. July 2000 –
July 2001. Forensic evaluations and testimony as an expert witness for mentally
ill inpatients at Orange County Superior Court L53.

## RESEARCH and PRESENTATIONS

### Books

Lavid N. 2003. *Understanding Stuttering*. University Press of Mississippi,
Jackson.

### Book Chapters

Lavid N, 2008. "Forensic Psychiatric Examination of the Noncompliant
Examinee: Application of Computerized Content Analysis;" *Computerized
Content Analysis of Speech and Verbal Texts*. Eds. Gottschalk, LA. & Bechtel ,
RJ. Chapter 12: 133-40. Nova Science Publishers, New York.

Lavid N, Gottschalk L, Bechtel R. 2005. "Computerized measurement of
neuropsychiatric traits in adolescents with eating disorders;" *Adolescent Eating
Disorders*. Ed. Swain, P. Chapter 1: 1-11. Nova Science Publishers, New York.

### Invited Publications

Lavid N. 2009. The Psychiatric Autopsy and Its Application in Law. Expert
Article, Atrium Psychological Group Monthly Newsletter Vol 5, Issue 3.

Lavid N. 2005. Serotonin-dopamine antagonists in the treatment of stuttering.
International Stuttering Awareness Day Online Conference.

Curriculum Vitae         .         Nathan E. Lavid, M.D.   .                                    5

Lavid N. 2002.  The relevance of speech therapy: A physician's viewpoint from a clinical and neuroscience perspective. International Stuttering Awareness Day Online Conference.

**Refereed Publications**

Reviewer. 2017.  *Practice Guidelines for the Pharmacological Treatment of Patients with Alcohol Use Disorder.* American Psychiatric Association, Washington, DC.

Lavid N. 2008.  "Ask the Expert" column on Akathisia for *Medscape Psychiatry and Mental Health.*  www.medscape.com

Reviewer. 2006.  *Practice Guidelines for the Treatment of Eating Disorders, 3rd edition.* American Psychiatric Association, Washington, DC.

Lavid N, Grayden T, Gottschalk L, Bechtel R.  2002.  Computerized Analysis of Refusal of Treatment: A Preliminary Study of the Influence of Neuropsychiatric Traits on Judicial Decision. *American Journal of Forensic Psychiatry*; 23 (3): 55-69.

Lavid N. 2000.  The Interface of Neuropsychiatric Disorders in the Elderly. *Resident & Staff Physician*; Oct. 23-26.

Lavid N, Budner L. 2000.  Review of the Pharmacological Treatment of Delirium in the Pediatric Population with Accompanying Protocol. *The Jefferson Journal of Psychiatry*; 15 (1): 25-33.

Lavid N, Franklin DL, Maguire GA.  1999.  Management of Child and Adolescent Stuttering with Olanzapine:  Three Case Reports. *Annals of Clinical Psychiatry*; 11 (4): 233-236.

Lavid N, DePaolis D, Pope T, Hinson G, Munns S, Batnitzky S, Wetzel L, Wilkinson S, Gordon M. 1996.  Analysis of Three-Dimensional Computerized Representations of Articular Cartilage Lesions. *Investigative Radiology*; 31 (9): 577-585.

**Refereed Abstracts**

Lavid N, Franklin DL, Maguire GA 2000.  The Treatment of Adult Stuttering with Olanzapine:  An Open Label Prospective Analysis.  Presented at the Annual Meeting of the American Psychiatric Association, May 13-18, Chicago, IL.

**Selected Presentations**

Curriculum Vitae                Nathan E. Lavid, M.D.                    6

"How Do Psychotropic Medications Affect Youth?" Faculty, Beyond the Bench 23: User Experience Conference, Judicial Council of California, Center for Families, Children & the Courts, Anaheim, CA – December 3, 2015.

"Rule 3-110 and Substance Abuse: A Judicial Perspective." Panelist, State Bar of California 2015 Annual Meeting, Anaheim, CA – October 11, 2015.

"How to Explain Mental Illness to Those Who Do Not Know: Focusing on Depression and Bipolar Disorders." Depression and Bipolar Support Alliance Orange County, Educational Meeting – September 21, 2015.

"Substance Abuse Issues in Custody Litigation." with Jason M. Schwartz, CFLS and Courtney L. Shepard, CFLS for Orange County Chapter of the Association of Certified Family Law Specialists, Orange, CA, November 17, 2014.

"Attorney as Patient: The Neuroscience of Addiction." Newport Harbor Bar Association, Newport Beach, CA – April 9, 2014.

"Depression: An Understanding from Antiquity to the Present." Depression and Bipolar Support Alliance Orange County, Educational Meeting – February 18, 2013.

"The Neuroscience of Addiction: It's Implication in Treatment." Saint Yared General Hospital, Addis Ababa, Ethiopia – December 28, 2011.

"Legal Aspects of Psychiatric Treatment: Involuntary Hospitalizations and Medications." NAMI Orange County Educational Meeting – February 10, 2011 & November 12, 2009.

"Neuroscience of Addiction and the Legal Implications in the Treatment of Addiction." NAMI Orange County Educational Meeting – May 13, 2010.

"Attorney as Patient: The Neuroscience of Addiction." AttorneyCredits.com – Continue Legal Education Course, first posted – March 2010.

"The Psychiatric Autopsy and Its Application in Law." AttorneyCredits.com – Continue Legal Education Course, first posted – January 2010.

"Competency and Insanity," Dynamics of Addiction and Criminal Behavior Course. Loyola Marymount University, Guest Lecture – April 3, 2008.

"The Disability Determination Process: Focus on the Social Security Administration Programs." University of California, Irvine, Department of Psychiatry and Human Behavior, Grand Rounds – February 25, 2003

"Understanding Stuttering: Discoveries in the Neurosciences." Good Samaritan Regional Medical Center, Phoenix, AZ, Department of Psychiatry, Grand Rounds – October 26, 2001.

"A History of the Western Conceptualization of the Mind and its Implications in Medicine." Long Beach Veteran's Administration Hospital, Long Beach, CA, Department of Psychiatry, Grand Rounds – December 15, 2000.

"Review of the Pharmacological Treatment of Delirium in the Pediatric Population with Accompanying Protocol." University of California, Irvine, Department of Psychiatry and Human Behavior, Grand Rounds – July 11, 2000.

"Analysis of Three-Dimensional Computerized Representations of Articular Cartilage Lesions." University of Kansas School of Medicine, Kansas City, KS, Student Research Forum – April 11, 1996.

"Comparison of the structural integrity of genetically engineered beta subunit from the chloroplast ATP synthase with the native beta subunit." University of Kansas, Lawrence, KS, Summer Research Symposium – July 26, 1992.

**Television and Radio**

"A Look Inside." Nathan Lavid, MD and Tom Grayden, MD, A review of the Andrea Yates case, September 20, 2002 KUCI 88.9 FM.

## HONORS and AWARDS

*Awarded position for Resident & Staff Physician's Resident Correspondent Program.* May 2000. Selected to write an article summarizing a presentation at the annual American Psychiatric Association Meeting in Chicago, IL.

*Shawn M. Storm, M.D. Memorial Award.* May 1997. Presented to the senior student who is entering residency in psychiatry and is perceived by the faculty to be most likely to succeed in the profession.

*Paul F. Funk Memorial Scholarship.* January 1997

*The Lattner Foundation Grant, Menninger Medical Student Program.* January 1997

*Elwood and Mamie S. Sharp Scholarship in Medicine.* August 1996

*Kansas Technology Enterprise Corporation Grant.* August of 1995 and September of 1996

*R.M. Gouldner Memorial Scholarship.* 1995 – 1997 school years

Ex C - 011

Curriculum Vitae                Nathan E. Lavid, M.D.                          8

*Harry and Georgie Trowbridge Scholarship*, 1995 – 1996 school year

*Howard Hughes Biomedical Research Award*, June 1992

*Endowment Merit Scholarship*, 1988 – 1992 school years

## PROFESSIONAL AFFILIATIONS

Family Law Panel, Child Custody Evaluator – Orange County 2009 – present

Forensic Expert Witness Association 2009 – present

American Academy of Psychiatry and the Law 2000 – present

Orange County Psychiatric Society 1997 – present

Distinguished Fellow, American Psychiatric Association 1996 – present

## VOLUNTEER and COMMUNITY SERVICE

*Representative.*  Orange County Psychiatric Society to the Judicial Action Committee of the California Psychiatric Association, June 2014 – present

*Member.* Orange County Psychiatric Society Ethics Committee, 2003 – present

*Member.* Orange County Psychiatric Society Distinguished Fellowship Committee, 2014 – present

*Volunteer Physician.* USA Amateur Boxing, 1997 – 2008

*Volunteer Physician.* Downtown Youth Center, Anaheim CA, 1997 – 2001

*Volunteer facilitator.* UCI Medical Center Alliance for the Mentally Ill Support Group, 1998 – 2000

*Monitor.* Annual Meeting of the American Academy of Child and Adolescent Psychiatry, fall of 1998

*Mentor.* Junior National Health Service Corps, 1995 – 1997

*Volunteer Medical Evaluator.* Shriners Hospitals Orthopedic and Burn Screening Clinic, 1995

*Volunteer.* Sunflower State Games, 1990 – 1995

Ex C - 012

Curriculum Vitae              Nathan E. Lavid, M.D.                        9

**PERSONAL**

Birth date: October 20, 1970

Ex C - 013

EXHIBIT  E

REINHARDT G HILZINGER, M.D.
7124 Borrego Way
Carmichael, California 95608
916-878-9517

RECEIVED

JUN 06 2017

DOI / HQIU
SACRAMENTO

EDUCATION

Residency: Family Practice, St. Luke's Hospital, Medical College of
Wisconsin, Milwaukee, Wisconsin 1985-1988

Medical School: Medical College of Wisconsin, Milwaukee, Wisconsin
1981-1985

Undergraduate: Carroll College, Helena, Montana; B.A. Biology,
Magna Cum Laude, May 1977

BOARD CERTIFICATION:

Diplomat, American Board of Family Medicine, Certified 1988-1995
Re-Certified: 1995-2001; 2001-2008; 2008-2015

LICENSURE:

California #G067727- November 1989 to present

PROFESSIONAL EXPERIENCE:

July 1, 2016 to present, semi retired, doing Orthopedic surgical
Assisting only

Sutter Medical Group, July 1991 to June 30, 2016

Staff Physician, Department of Family Medicine, U.S. Air Force
Hospital, Mather AFB, Sacramento, California, Aug. 1988-Jun.1991

Tactical Physician, Sacramento County Sheriff Department Special
Enforcement Detail, 1998-present. Level three reserve deputy.

PROFESSIONAL AFFILIATIONS:

American Academy of Family Practice
California Academy of Family Practice
Sacramento- Sierra Valley Medical Society
National Tactical Officers Association

**Ex B - 006**

PERSONAL INFORMATION:

|  |  |
|---|---|
| Date of Birth: | May 19, 1955 |
| Birthplace: | Red Lodge, Montana. |
| Marital Status: | Married |
| Spouse: | Sharon Zorn |

EXHIBIT  F

1    XAVIER BECERRA
     Attorney General of California
2    ALEXANDRA M. ALVAREZ
     Supervising Deputy Attorney General
3    MEGAN R. O'CARROLL
     Deputy Attorney General
4    State Bar No. 215479
     1300 I Street, Suite 125
5    P.O. Box 944255
     Sacramento, CA 94244-2550
6    Telephone: (916) 324-5288
     Facsimile: (916) 327-2247
7
     *Attorneys for Complainant*
8

9

**FILED**
**STATE OF CALIFORNIA**
**MEDICAL BOARD OF CALIFORNIA**
SACRAMENTO ___Jan 9___ 20 __18__
BY __D. Richards__ ANALYST

10                       **BEFORE THE**
**MEDICAL BOARD OF CALIFORNIA**
11          **DEPARTMENT OF CONSUMER AFFAIRS**
**STATE OF CALIFORNIA**
12

13

| | |
|---|---|
| 14   In the Matter of the Accusation Against: | Case No. 800-2015-018187 |
| 15   **Hanna Queen Rhee, M.D.** <br> **912 Hazel St.** | **A C C U S A T I O N** |
| 16   **Gridley, CA 95948-2114** | |
| 17   **Physician's and Surgeon's Certificate No.** <br> **No. A 116932,** | |
| 18 | |
| 19                Respondent. | |

20

21      Complainant alleges:

22                         **PARTIES**

23      1.      Kimberly Kirchmeyer (Complainant) brings this Accusation solely in her official

24   capacity as the Executive Director of the Medical Board of California, Department of Consumer

25   Affairs (Board).

26      2.      On or about May 11, 2011, the Medical Board issued Physician's and Surgeon's

27   Certificate No. Number A 116932 to Hanna Queen Rhee, M.D. (Respondent). The Physician's

28

1

1  and Surgeon's Certificate No. A 116932 was in full force and effect at all times relevant to the

2  charges brought herein and will expire on August 31, 2018, unless renewed.

3  **JURISDICTION**

4      3.    This Accusation is brought before the Board, under the authority of the following

5  laws. All section references are to the Business and Professions Code (Code) unless otherwise

6  indicated.

7      4.    Section 2227 of the Code provides that a licensee who is found guilty under the

8  Medical Practice Act may have his or her license revoked, suspended for a period not to exceed

9  one year, placed on probation and required to pay the costs of probation monitoring, or such other

10  action taken in relation to discipline as the Board deems proper.

11      5.    Section 2234 of the Code, states:

12  "The board shall take action against any licensee who is charged with unprofessional

13  conduct. In addition to other provisions of this article, unprofessional conduct includes, but is not

14  limited to, the following:

15      "(a) Violating or attempting to violate, directly or indirectly, assisting in or abetting the

16  violation of, or conspiring to violate any provision of this chapter.

17      "(b) Gross negligence.

18      "(c) Repeated negligent acts. To be repeated, there must be two or more negligent acts or

19  omissions. An initial negligent act or omission followed by a separate and distinct departure from

20  the applicable standard of care shall constitute repeated negligent acts.

21      "(1) An initial negligent diagnosis followed by an act or omission medically appropriate

22  for that negligent diagnosis of the Patient shall constitute a single negligent act.

23      "(2) When the standard of care requires a change in the diagnosis, act, or omission that

24  constitutes the negligent act described in paragraph (1), including, but not limited to, a

25  reevaluation of the diagnosis or a change in treatment, and the licensee's conduct departs from the

26  applicable standard of care, each departure constitutes a separate and distinct breach of the

27  standard of care.

28      "(d) Incompetence.

2

(HANNA QUEEN RHEE, M.D.) ACCUSATION NO. 800-2015-018187

1   "(e) The commission of any act involving dishonesty or corruption which is substantially

2   related to the qualifications, functions, or duties of a physician and surgeon.

3   "(f) Any action or conduct which would have warranted the denial of a certificate.

4   "(g) The practice of medicine from this state into another state or country without meeting

5   the legal requirements of that state or country for the practice of medicine. Section 2314 shall not

6   apply to this subdivision. This subdivision shall become operative upon the implementation of the

7   proposed registration program described in Section 2052.5.

8   "(h) The repeated failure by a certificate holder, in the absence of good cause, to attend and

9   participate in an interview by the board. This subdivision shall only apply to a certificate holder

10   who is the subject of an investigation by the board."

11   6.     Section 2266 of the Code states: "The failure of a physician and surgeon to maintain

12   adequate and accurate records relating to the provision of services to their Patients constitutes

13   unprofessional conduct."

14   7.     Section 820 of the Code states:

15   "Whenever it appears that any person holding a license, certificate or permit under this

16   division or under any initiative act referred to in this division may be unable to practice his or her

17   profession safely because the licentiate's ability to practice is impaired due to mental illness, or

18   physical illness affecting competency, the licensing agency may order the licentiate to be

19   examined by one or more physicians and surgeons or psychologists designated by the agency.

20   The report of the examiners shall be made available to the licentiate and may be received as direct

21   evidence in proceedings conducted pursuant to Section 822."

22   8.     Section 821 of the Code provides that the licentiate's failure to comply with an order

23   issued under section 820 shall constitute grounds for the suspension or revocation of the

24   licentiate's certificate of license.

25   9.     Section 822 of the Code states:

26   "If a licensing agency determines that its licentiate's ability to practice his or her profession

27   safely is impaired because the licentiate is mentally ill, or physically ill affecting competency, the

28   licensing agency may take action by any one of the following methods:

3

(HANNA QUEEN RHEE, M.D.) ACCUSATION NO. 800-2015-018187

1      "(a) Revoking the licentiate's certificate or license.

2      "(b) Suspending the licentiate's right to practice.

3      "(c) Placing the licentiate on probation.

4      "(d) Taking such other action in relation to the licentiate as the licensing agency in its

5      discretion deems proper.

6      "The licensing section shall not reinstate a revoked or suspended certificate or license until

7      it has received competent evidence of the absence or control of the condition which caused its

8      action and until it is satisfied that with due regard for the public health and safety the person's

9      right to practice his or her profession may be safely reinstated."

10                                   **CAUSE FOR ACTION**

11                        **(Mental or Medical Condition Affecting Competency)**

12          10.    Respondent began working as a locum tenens physician at the Orchard Hospital

13      Medical Specialty Center in Gridley, California in or about March of 2015. During May of 2015,

14      Orchard Hospital Medical Specialty Center signed a three-year employment contract with

15      Respondent, but she resigned during investigation after only five months. During the five months

16      that she was working at the Medical Specialty Center, there were a number of patient and staff

17      complaints regarding her care and treatment of patients.

18          11.    On or about November 17, 2015, the Medical Board of California (Board) received a

19      report under Business and Professions Code section 805 indicating that Respondent resigned her

20      privileges at Orchard Hospital Medical Specialty Center in Gridley, California while an

21      investigation was pending, and the resignation was effective September 17, 2015. The

22      investigation was due to a number of patients and staff members registering complaints about

23      Respondent's behavior and her clinical competence.

24          12.    On or about January 7, 2016, the Board received a letter from one of Respondent's

25      former coworkers, a physician. The letter stated that he had left the Medical Specialty Center in

26      Gridley, due in part to harassment from Respondent. He was writing to ensure that the hospital

27      had reported her conduct to the Board and that the Board would be investigating her. He reported

28      his belief that Respondent is an incompetent physician with possible psychiatric problems.

                                              4

1      13.    The Board opened an investigation into the facts and circumstances surrounding

2  Respondent's resignation while under investigation by Orchard Hospital Medical Specialty

3  Center. During the investigation, Board investigators gathered documents and interviewed

4  patients and staff. Several nurses and medical assistants who worked with Respondent reported

5  that Respondent had a phobia of germs and refused to shake hands, instead offering an "elbow

6  bump" to greet others. The administrative staff at Orchard Hospital Medical Specialty Center

7  also received several patient complaints that Respondent would not touch or examine them when

8  they presented for appointments. A Medical Assistant who had worked with Respondent

9  indicated that she never once observed Respondent touch a patient during an appointment.

10  Several staff members reported that Respondent refused to see male, Hispanic patients after 4:00

11  p.m., or to perform genital examinations on male patients. Other physicians and nurse

12  practitioners at the Medical Specialty Clinic reported Respondent failed to properly examine or

13  treat patients for serious conditions requiring immediate medical attention. Instead, she would

14  make new appointments for these patients with the other practitioners a few days after she had

15  seen them in their initial appointments herself.

16      14.    On or about January 3, 2017, Board investigators interviewed Respondent about the

17  events surrounding her resignation from Orchard Hospital Medical Specialty Center. Respondent

18  confirmed that she did not perform genital examinations on patients, but stated that this was due

19  to her lack of qualification to conduct genital examinations. However, in subsequent

20  correspondence with Orchard Hospital Medical Specialty Center she claimed her refusal to

21  perform genital examinations was due to "moral" and "religious" issues.

22      15.    Board investigators also learned that the staff at the Medical Specialty Center had

23  observed Respondent displaying bizarre behaviors in her interactions with other staff members.

24  For example, the Chief of Staff reported that Respondent often accused him and others of yelling

25  at her despite everyone using a normal tone and volume of voice. In addition, he reported that

26  Respondent had been spending nights in the clinic, even after being asked not to be present unless

27  she was scheduled to work. He noted that she kept a bedroll and sleeping bag under her desk.

28  ///

1    16.    The Director of the Medical Specialty Center reported that she received complaints

2    from several staff members that they caught Respondent going through their mail and listening

3    surreptitiously at doors to conversations others were having. The Medical Director explained that

4    when Respondent was confronted about this behavior she did not deny it. Respondent was

5    counseled and issued a formal warning letter on or about August 5, 2015, for listening at doors to

6    private conversations, going through other individuals' desks and mailboxes, and accessing

7    medical records of individuals who were not her patients in violation of privacy protections.

8    17.    On or about Saturday, August 29, 2015, approximately two weeks after the Chief of

9    Staff had instructed Respondent not to be present at the facility when she was not scheduled to

10    work, a strange incident occurred at the Medical Specialty Center. Respondent spoke to the

11    Director by telephone reporting that she felt unsafe because another physician present was

12    threatening her. The Director explained that the physician was authorized to be at the facility that

13    day, and Respondent was not authorized to be present, and Respondent should leave immediately.

14    The Director required Respondent to verbalize that she was leaving the facility. Respondent did

15    so. The Director then proceeded to the facility, without warning Respondent that she was going

16    there. When the Director arrived approximately 20 minutes later, Respondent was still present in

17    the building, and claimed to be barricaded in her office for protection. The Director saw

18    Respondent off the premises.

19    18.    On or about July 28, 2017, the Board issued an order compelling Respondent to

20    undergo a mental evaluation. On or about August 18, 2017, Respondent was evaluated by a

21    Board-certified psychiatrist who concluded that Respondent exhibits paranoid thoughts, which fit

22    within a persecutory delusional disorder. Based on the materials provided to him, and his

23    interview with Respondent, he found that many of Respondent's paranoid delusional thoughts are

24    attributed to medical institutions. Given that a physician is required to accurately interpret reality

25    in the medical field in order to practice medicine safely, he concluded that Respondent presently

26    suffers from paranoia which could substantially impair her ability to safely practice medicine and

27    that the public is in danger if Respondent is permitted to continue to practice medicine.

28    ///

6

1    19.    Respondent's conditions and actions as set forth above demonstrate that she has a

2    physical or mental condition affecting her competency to practice medicine, thus subjecting her

3    license to action under section 822 of the Code.

4                                    **FIRST CAUSE FOR DISCIPLINE**

5                                      **(Gross Negligence, Patient 1)**

6    20.    Respondent Hanna Queen Rhee, M.D. is subject to disciplinary action under section

7    2234, subsection (b) of the Code in that she was grossly negligent in the care and treatment of

8    Patient 1.[1]  The circumstances are as follows:

9    21.    Respondent first saw Patient 1 on or about March 16, 2015.  Patient 1 had a past

10   medical history of coronary artery disease, heart attack in 2014, with multi-organ failure requiring

11   dialysis, Crohn's disease, Barrett's esophagitis, a coccyx decubitus and pneumonia.  He had been

12   seen recently in the Emergency Room for pneumonia.  His current medications were listed.

13   22.    Respondent documented an examination that did not correspond to the prescriptions

14   and medical history of Patient 1, and frequently contradicted other portions of the record.  For

15   example, Respondent documented that Patient 1 was well developed and nourished, but Patient 1

16   was specifically noted to be cachectic.  The other systems were also described as normal despite

17   recent history of admission to the Emergency Room, and ongoing treatment for chronic

18   conditions.  Respondent made no notations as to whether or not Patient 1 had shortness of breath

19   with activity, chest pain with activity, or leg swelling, despite his history of heart disease.  And

20   despite Patient 1's recent Emergency Room visit for pneumonia, Respondent did not document

21   his respiratory status or complaints.  Respondent conducted no review of depressive symptoms,

22   anxiety symptoms or ADD symptoms.  Respondent noted that Patient 1 had a stage 3 pressure

23   ulcer of the coccyx, which was 2 by 2 centimeters.

24   23.    Respondent's assessment and plan was listed as: 1) cardiac arrest, refer to cardiology;

25   2) ADD, no refills until old records and psych referral; 3) anxiety, continue Clonazepam; 4)

26   depression, continue trazodone/psych consult; 5) asthma, continue proair inhaler; 6) pressure

27

28   _____

[1] The patients are referred to by numbers in this Accusation to protect their privacy.

7

1  ulcer, refer to wound care and nutrition for cachexia; 7) pneumonia, continue z-pack.

2  Respondent's notes did not explain the reason why Patient 1 was on pain medication.

3      24.   Respondent saw Patient 1 again on or about March 27, 2015. Respondent noted

4  Patient 1 to be "cachexic amphetamined'd cardiac arrest," multiple MI, chronic pain rule out

5  opiate dependence, recent Emergency Room visit for ventricular tachycardia. Again

6  Respondent's examination incorrectly stated that all of Patient 1's systems were normal and he

7  was described as well nourished with no skin lesions, regular heart rhythms and no murmurs. The

8  neck examination listed a normal range of motion and there was no back examination listed. Yet,

9  at the end of the report of a normal examination, Respondent wrote "cachexic, cervical lumbar

10  decrease range of motion no elicited pain." No further explanation was given.

11      25.   Respondent's assessment and plan for the March 27, 2015 visit indicated that she was

12  assessing him with cardiac arrest and unspecified cardiac arrhythmia, for which she referred him

13  to cardiology and ordered an echocardiogram and to taper off the methylphenidate. There was no

14  indication given for the echocardiogram, and Respondent did not establish a taper of the

15  methylphenidate. Instead Respondent refilled the methylphenidate prescription at the same dose.

16  Respondent referred Patient 1 to radiology for his cardiac history, but did not indicate why.

17  Respondent referred Patient 1 to psychiatry and refilled the current medications. For the GERD,

18  which was not discussed in the history, Respondent directed Patient 1 to stay on Nexium. As to

19  the chronic pain due to trauma, Respondent did not document a history of trauma, and the medical

20  record only noted neck and back pain in the assessment. Nonetheless, Respondent ordered a

21  spinal survey, directed a taper of medication and referred Patient 1 to pain management. For the

22  cachexia, Respondent referred Patient 1 to nutrition. Patient 1 was to follow up in two weeks.

23      26.   Respondent saw Patient 1 in follow up on or about April 17, 2015 to review the

24  echocardiogram results and spine x-ray results. Patient 1 reported that his left arm was going

25  numb, and that three weeks ago he had decreased sensation in his right hand. He reported he had

26  burned his right hand on the stove, and could not move it well. He also reported that decreased

27  sensation of his left hand and a burning pain like frostbite, with no recollection of any injury to

28  the area. Respondent again noted that Patient 1 needed to taper off the methylphenidate, and

8

1    again did not establish a taper. Respondent again noted that her review of Patient 1's systems and

2    examination to be normal, and again incorrectly noted Patient 1 to be well nourished. The neck

3    examination was again noted to be normal, and the range of motion was normal. There was no

4    documented neurological examination, and only a statement that the right upper extremity was

5    "less sensory, decreased grip, ad normal range of motion and 2+ pulses." The left hand was noted

6    to be "less sensory, normal motor, range of motion and 2+ pulses."

7         27.    Respondent's assessment and plan for Patient 1 noted chronic pain and trauma, for

8    which she ordered an MRI with and without contrast for the cervical thoracic and lumbar spine.

9    Respondent stated she ordered the MRI because Patient 1 had a stage three coccyx ulcer/abscess

10   and had complained of headache that woke him up, a stiff neck, and problems with concentrating.

11   Second, Respondent noted that Patient 1 had unspecified neuralgia, neuritis, and radiculitis. She

12   indicated she wanted the spinal MRI to rule out meningitis mass or degenerative disc disease.

13   The third item on the assessment and plan listed cellulitis and abscess of an unspecified site. For

14   this finding Respondent ordered serum uric acid, Vitamin D 25-hydroxy, testosterone, free and

15   total, lipid panel, basic metabolic panel, and a CBC. She indicated no reason for these tests.

16   Respondent's chart note indicated "'It's worse than I thought' rocephn'd. Plan: fasting labs

17   decline tap, MRI, monitor refer hayes, f/u ncv." Patient 1 was then given an injection of

18   Rocephin and Sensorcaine by a nurse. The end of the chart note indicated that Patient 1 was to

19   follow up Tuesday afternoon with the reason listed as "wound, refer hayes." Patient 1 passed

20   away a few days after that visit.

21        28.    Respondent was grossly negligent in her care and treatment of Patient 1, for her acts

22   including, but not limited to, the following:

23        A. Failing to perform and document an adequate and accurate history and physical that

24   comported with her assessment of Patient 1;

25        B. Documenting that Patient 1 was well developed and nourished despite the fact that he

26   was cachectic;

27        C. Failing to document respiratory symptoms in a patient with recent pneumonia;

28   ///

9

D. Failing to document cardiac symptoms in a patient with a history of cardiac arrest and arrhythmia;

E. Failing to document the symptoms of ADD, anxiety or depression;

F. Failing to note the reason Patient 1 was on pain medications;

G. Failing to document the sensory examination as "less sensory," which omits significant clinical information;

H. Failing to documenting the results of echo or spinal x-ray she ordered;

I. Failing to provide testing and treatment consistent with the physical exam findings, assessments, and differential diagnoses;

J. Failing to provide a methylphenidate taper and instead refilling the prescription despite instructing Patient 1 to taper;

K. Injecting Rocephin for reasons not explained or documented in record;

L. Directing Patient 1 to transition to methadone for abscess of an unspecified site with no explanation regarding why cellulitis was assessed; and

M. Ordering lab tests and imaging not indicated by the examination or history.

## SECOND CAUSE FOR DISCIPLINE

### (Repeated Negligent Acts, Patient 1)

29.    Respondent Hanna Queen Rhee, M.D. is subject to disciplinary action under section 2234, subsection (c), of the Code, in that she was repeatedly negligent in the care and treatment of Patient 1.

30.    Paragraphs 20 through 28, above, are incorporated by reference and repeated as if set forth.

31.    Respondent was repeatedly negligent in her care and treatment of Patient 1 for her acts including, but not limited to, the following:

A. Failing to perform and document an adequate and accurate history and physical that comported with her assessment of Patient 1;

B. Documenting that Patient 1 was well developed and nourished despite the fact that he was cachectic;

10

1    C. Failing to document respiratory symptoms in a patient with recent pneumonia;

2    D. Failing to document cardiac symptoms in a patient with a history of cardiac arrest and
3    arrhythmia;

4    E. Failing to document the symptoms of ADD, anxiety or depression;

5    F. Failing to note the reason Patient 1 was on pain medications;

6    G. Failing to document the sensory examination as "less sensory," which omits significant
7    clinical information;

8    H. Failing to documenting the results of echo or spinal x-ray she ordered;

9    I. Failing to provide testing and treatment consistent with the physical exam findings,
10    assessments, and differential diagnoses;

11    J. Failing to provide a methylphenidate taper and instead refilling the prescription despite
12    instructing Patient 1 to taper;

13    K. Injecting Rocephin for reasons not explained or documented in record;

14    L. Directing Patient 1 to transition to methadone for abscess of an unspecified site with no
15    explanation regarding why cellulitis was assessed; and

16    M. Ordering lab tests and imaging not indicated by the examination or history.

17    **THIRD CAUSE FOR DISCIPLINE**

18    **(Gross Negligence, Patient 2)**

19    32.    Respondent Hanna Queen Rhee, M.D. is subject to disciplinary action under section
20    2234, subsection (b), of the Code, in that she was grossly negligent in the care and treatment of
21    Patient 2. The circumstances are as follows:

22    33.    Patient 2 was a 58-year-old woman who saw Respondent on or about May 11, 2015,
23    complaining of shortness of breath and diarrhea for the previous week. Patient 2's past medical
24    history listed Type 2 diabetes, anxiety, heart attack, neuropathy of the arms and legs, depression,
25    COPD, high cholesterol, hypertension, chronic pain, and allergy to outside air. Respondent
26    charted a review of systems for Patient 2 that did not include any symptoms involving shortness
27    of breath or diarrhea. Under the "Examination" section of the chart, Respondent wrote, " Gait
28    Analysis: SOB at rest "'i don't want to go to the ER...i won't go to the ER', high bp asymp,

11

1  stable. Ao x3 nad." During an interview with Board investigators, when asked about whether she
2  performed an examination of Patient 2, Respondent stated that she did not document an
3  examination because Patient 2 needed to go to the Emergency Room. However, there is nothing
4  in the chart to indicate that Respondent directed or recommended Patient 2 go to the Emergency
5  Room, or why.

6      34.    Respondent's assessment and plan for Patient 2 listed four issues under the
7  assessment, diarrhea, congestive heart failure unspecified, other and unspecified angina pectoris,
8  and nausea. Respondent listed treatment in a five-part summary. The first was for unspecified
9  angina pectoris. She prescribed nitroglycerin, immediately, 0.4 milligrams sublingually for the
10  angina. Second, for the diarrhea she directed Patient 2 to take kaopectate. Third, for the
11  congestive heart failure she noted Patient 2 had recently seen a cardiologist who ordered Imdur.
12  Respondent further directed Patient 2 to also use the sublingual nitroglycerin for this. Fourth, for
13  the nausea, Respondent noted Patient 2 had obtained relief from Phenergan in the past, and noted
14  that the nausea was likely related to the cardiac condition. Patient 2 was then given an injection
15  of Phenergan by the nurse. Respondent directed Patient 2 to follow up in two or three days.

16      35.    Respondent was grossly negligent in her care and treatment of Patient 2 for her acts,
17  including, but not limited to, the following:

18      A. Failing to perform and document an adequate and accurate history and physical that
19  comported with her assessment of Patient 2; and

20      B. Failing to provide testing and treatment consistent with the physical exam findings,
21  assessments, and differential diagnoses.

22                      **FOURTH CAUSE FOR DISCIPLINE**

23                      **(Repeated Negligent Acts, Patient 2)**

24      36.    Respondent Hanna Queen Rhee, M.D. is subject to disciplinary action under section
25  2234, subsection (c), of the Code, in that she was repeatedly negligent in the care and treatment of
26  Patient 2.

27      37.    Paragraphs 32 through 35, above, are incorporated by reference and repeated as if set
28  forth.

12

1    38.   Respondent was repeatedly negligent in her care and treatment of Patient 2 for her

2  acts, including, but not limited to, the following:

3    A. Failing to perform and document an adequate and accurate history and physical that

4  comported with her assessment of Patient 2; and

5    B. Failing to provide testing and treatment consistent with the physical exam findings,

6  assessments, and differential diagnoses.

7               **FIFTH CAUSE FOR DISCIPLINE**

8               **(Gross Negligence, Patient 3)**

9    39.   Respondent Hanna Queen Rhee, M.D. is subject to disciplinary action under section

10  2234, subsection (b) of the Code in that she was grossly negligent in the care and treatment of

11  Patient 3. The circumstances are as follows:

12    40.   Patient 3 was a 50-year-old man who presented to the Medical Specialty Center in

13  Gridley on or about July 5, 2015, with a history of genital pain for the previous three days.

14  Respondent charted Patient 3's present complaint to be right scrotal pain, with no prior event, that

15  came on suddenly. She noted he had pain of 4/10, and denied chest pain, dizziness,

16  lightheadedness, stomach upset, dysuria, fever or chills, and nausea.

17    41.   Respondent charted a review of systems with no positive findings. The examination

18  note contained a template list of examinations with normal findings for General, Cardiac, Lungs,

19  and Abdominal systems. Below these is an examination note with a heading "genital" that states,

20  "no rash, hernia unable elicit pain." When discussing her care of Patient 3 with the Board's

21  investigators, Respondent initially reinforced that she does not do genital examinations, and

22  explained that she had the interpreter present explain this to Patient 3. When the investigator

23  asked her to explain what she meant in her chart note about not being able to elicit pain, however,

24  Respondent stated that she palpated Patient 3's testicle. Upon further inquiry, she stated that she

25  had no specific recollection of the Patient or whether she palpated the testicle. She further

26  confirmed that she does not perform physical palpation of men to check for inguinal hernias, and

27  therefore, she did not perform an internal palpitation of Patient 3's inguinal canal to check for a

28  hernia.

13

42. Respondent did not order any cultures or urinalysis for Patient 3. She did not order a scrotal ultrasound. Respondent's assessment of Patient 3 was that of unspecified disorder of male genital organs. She prescribed Motrin, and directed him to follow up with his primary care physician. She did not indicate any timeframe for Patient 3 to follow up with his primary care physician. Although she reported that Patient 3's complaint of scrotal pain was not reproducible during her examination, Patient 3 was seen by another physician three days later who reported that his testicle was very painful during his appointment with Respondent.

43. Respondent was grossly negligent in her care and treatment of Patient 3 for her acts, including, but not limited to, the following:

A. Failing to order any cultures or urinalysis for Patient 3;

B. Failing to order a scrotal ultrasound;

C. Failing to consider a diagnosis of epididymitis; and

D. Failing to document or perform a physical examination.

## SIXTH CAUSE FOR DISCIPLINE

### (Repeated Negligent Acts, Patient 3)

44. Respondent Hanna Queen Rhee, M.D. is subject to disciplinary action under section 2234, subsection (c), of the Code, in that she was repeatedly negligent in the care and treatment of Patient 3. The circumstances are as follows:

45. Paragraphs 39 through 43, above, are incorporated by reference and repeated as if set forth.

46. Respondent was repeatedly negligent in her care and treatment of Patient 3 for her acts, including, but not limited to, the following:

A. Failing to order any cultures or urinalysis for Patient 3;

B. Failing to order a scrotal ultrasound;

C. Failing to consider a diagnosis of epididymitis; and

D. Failing to document or perform a physical examination.

///

///

14

1

2

## SEVENTH CAUSE FOR DISCIPLINE

### (Gross Negligence, Patient 4)

3      47.    Respondent Hanna Queen Rhee, M.D. is subject to disciplinary action under section

4  2234, subsection (b), of the Code, in that she was grossly negligent in the care and treatment of

5  Patient 4. The circumstances are as follows:

6      48.    Patient 4 was seen by Respondent on or about September 1, 2015 for a follow up

7  from the hospital. Respondent recorded that Patient 4 had been in the Emergency Room after

8  drinking on her birthday. She was reportedly not feeling well and was shaky. Respondent

9  recorded that the Patient's blood work in the Emergency Room showed that she had low

10  magnesium and sodium. The review of systems Respondent charted was all listed as normal.

11  Respondent charted an examination containing the same template language seen in other records

12  for General, Cardiac, and Lungs, finding no positive signs. Respondent's recorded examination

13  continued, noting that the Patient had bilateral conjunctival injection, nasal terminates boggy grey

14  and wheezing breathing, resting fine motor tremor both hands, she appeared anxious, denied

15  suicidal ideation, had no guns and the CAGE (a problem drinking screen) was negative. The

16  finding of wheezing contradicted the template language under the lung examination finding the

17  lungs clear to auscultation bilaterally.

18      49.    Respondent listed five findings under assessment for Patient 4, which were Allergy,

19  encounter for long-term use of medications, elevated blood pressure, anxiety, and alcohol

20  withdrawal. The treatment plan had no plan to correspond with the anxiety assessment. For the

21  alcohol withdrawal, Respondent prescribed Klonopin, 1 milligram orally, twice per day. For the

22  allergy assessment, Respondent prescribed an albuterol inhaler and Claritin tablets. For long term

23  use of medication, Respondent ordered a number of lab tests including uric acid, hemoglobin

24  A1c, magnesium, lipid panel, thyroid tests, basic metabolic panel, CBC, sed rate, liver function

25  test, urine micro albumin and a CRP. There was no explanation as to why each of these tests was

26  ordered. The plan for the elevated blood pressure was a low salt diet and monitoring. She was

27  directed to follow up in one week.

28  ///

1      50.    The following day, on or about September 2, 2015, Patient 4's brother went to the

2   Medical Specialty Center regarding concerns he had with the care provided to his sister, and

3   specifically his concern with the prescription for Klonopin. He attempted to speak with

4   Respondent, but she stated she was busy with other work, could not hear him, and was concerned

5   with potential privacy issues in speaking about the patient. She directed him to write down any

6   concerns he had.

7      51.    Patient 4's brother left a detailed note for Respondent explaining that Patient 4 was

8   recently detoxed for alcohol at Orchard Hospital Emergency Room on or about August 1, 2015.

9   Her blood alcohol level on that occasion was .72%. He stated that Patient 4 was suicidal and had

10  been placed on involuntary mental health holds four times in the past and had texted a suicide

11  note to him in the last few days. Patient 4's brother expressed concern that Respondent had

12  prescribed Klonopin to a suicidal patient, given the contraindications of alcohol use and suicidal

13  ideation. He further indicated that Patient 4 was non-compliant with medications and that he had

14  located several months of unused medications, and that her blood pressure at the Emergency

15  Room was 215/160, due to alcohol consumption. Respondent indicated in her interview with

16  Board investigators that she had no access to hospital records of Patient 4 that may have contained

17  a history that Patient 4's brother reported.

18     52.    Respondent was grossly negligent in her care and treatment of Patient 4 for her acts,

19  including, but not limited to, the following:

20     A.    Failing to obtain and document an accurate and adequate history in spite of information

21  being offered by a relative;

22     B.    Failing to indicate the reason for many of the lab tests ordered;

23     C.    Failing to order a folate test or prothrombin test; and

24     D.    Providing improper treatment for alcoholism by failing to refer to inpatient treatment

25  and failure to prescribe thiamine or multi-vitamin.

26  / / /

27  / / /

28  / / /

16

**EIGHTH CAUSE FOR DISCIPLINE**

**(Repeated Negligent Acts, Patient 4)**

53.    Respondent Hanna Queen Rhee, M.D. is subject to disciplinary action under section 2234, subsection (c), of the Code, in that she was repeatedly negligent in the care and treatment of Patient 4. The circumstances are as follows:

54.    Paragraphs 47 through 52, above, are incorporated by reference and repeated as if set forth.

55.    Respondent was repeatedly negligent in her care and treatment of Patient 4 for her acts, including, but not limited to, the following:

A.  Failing to obtain and document an accurate and adequate history in spite of information being offered by a relative;

B.  Failing to indicate the reason for many of the lab tests ordered;

C.  Failing to order a folate test or prothrombin test; and

D.  Providing improper treatment for alcoholism by failing to refer to inpatient treatment and failure to prescribe thiamine or multi-vitamin.

**NINTH CAUSE FOR DISCIPLINE**

**(Gross Negligence, Patient 5)**

56.    Respondent Hanna Queen Rhee, M.D. is subject to disciplinary action under section 2234, subsection (b) of the Code in that she was grossly negligent in the care and treatment of Patient 5. The circumstances are as follows:

57.    Patient 5 was a 66-year-old man when he was seen by Respondent on or about September 2, 2015. Patient 5 was being seen for evaluation of anxiety and because his previous provider had left the clinic and he was establishing care with Respondent. Patient 5 was requesting a refill for Ativan for anxiety and for Nasonex for his allergies. Respondent documented that Patient 5 was an alcoholic but had quit last month and that he had been seen by a cardiologist six months ago for an enlarged heart. Respondent also documented that Patient 5 had shortness of breath and cannot walk more than five feet, which is normal for him as he is always short of breath. Respondent documented Patient 5's past history as having COPD, an enlarged

17

1   heart, and seizures.  Patient 5's vital signs were charted with a blood pressure of 180/121 and a

2   heart rate of 122.  Under examination, Respondent listed that Patient 5 was alert, in no acute

3   distress, his heart was irregular with no murmurs gallops or rubs, his lungs had decreased

4   respiration bilateral lower lobes, with rapid shallow wheezing throughout.  Respondent then

5   recorded, "No I won't go to the ER... I don't want to go, .2 clonidined, ok... I'll go to the

6   ER...but I can't walk there because I can't breathe."

7        58.    Respondent's assessment for Patient 5 provided five entries: (1) encounter for long

8   term use of other medications; (2) hypertrophy (benign) of prostate without urinary obstruction;

9   (3) chronic airway obstruction; (4) hypertension; and (5) atrial fibrillation.  Her plan for the long

10  term use of medications was again to perform a series of laboratory tests without specific

11  indications noted for the tests.  No plan was listed for the hypertrophy of prostate.  For the airway

12  obstruction, hypertension and atrial fibrillation, the plan was to go to the Emergency Room, and

13  Respondent further ordered clonidine, and provided a referral to pulmonology.

14       59.    Respondent called the Emergency Room physician to advise that she was sending

15  Patient 5 to them for treatment of tachycardia and hypertension.  He arrived via wheelchair, and

16  upon evaluation his blood pressure was 140/101 and his heartrate was 104.  His oxygen saturation

17  was 98% and he was mildly short of breath.  He reported that he had quit drinking and smoking

18  marijuana for the last month and had explained to Respondent that he was experiencing severe

19  anxiety to the point of blacking out.  He reported that Respondent had refused to refill the Ativan

20  as she stated she did not believe in it and that he felt the need to get away from Respondent.  He

21  stated that if his doctor did not care about his sobriety he felt like he should start drinking again.

22  The Emergency Room confirmed Patient 5 had been on Ativan and refilled this for one week

23  while making an appointment for him to see another provider in a week.

24       60.    The following week Patient 5 saw another provider at the Medical Specialty Center

25  who changed him to Valium to help him with the withdrawal symptoms and prescribed ReVia to

26  help with alcohol cravings.  She provided support and guidance on addiction issues and obtained

27  imaging for his other medical conditions.

28

(HANNA QUEEN RHEE, M.D.) ACCUSATION NO. 800-2015-018187

1     61.   Respondent was grossly negligent in her care and treatment of Patient 5 for her acts,

2 including, but not limited to, the following:

3     A. Failing to perform or document an appropriate examination of a patient with decreased

4 respiration and irregular heartrate;

5     B. Failing to document the reason for the referral to the Emergency Room;

6     C. Failing to conduct an adequate history and examination of urinary and prostate

7 symptoms; and

8     D. Failing to provide testing and treatment consistent with the physical exam findings,

9 assessments, and differential diagnoses.

10 **TENTH CAUSE FOR DISCIPLINE**

11 **(Repeated Negligent Acts, Patient 5)**

12     62.   Respondent Hanna Queen Rhee, M.D. is subject to disciplinary action under section

13 2234, subsection (c) of the Code in that she was repeatedly negligent in the care and treatment of

14 Patient 5.

15     63.   Paragraphs 56 through 61, above, are incorporated by reference and repeated as if set

16 forth.

17     64.   Respondent was repeatedly negligent in her care and treatment of Patient 5 for her

18 acts, including, but not limited to, the following:

19     A. Failing to perform or document an appropriate examination of a patient with decreased

20 respiration and irregular heartrate;

21     B. Failing to document the reason for the referral to the Emergency Room;

22     C. Failing to conduct an adequate history and examination of urinary and prostate

23 symptoms; and

24     D. Failing to provide testing and treatment consistent with the physical exam findings,

25 assessments, and differential diagnoses.

26 ///

27 ///

28 ///

19

## ELEVENTH CAUSE FOR DISCIPLINE

### (Gross Negligence, Patient 6)

65.    Respondent Hanna Queen Rhee, M.D. is subject to disciplinary action under section 2234, subsection (b), of the Code, in that she was grossly negligent in the care and treatment of Patient 6. The circumstances are as follows:

66.    Patient 6 was a 26-year-old woman when she saw Respondent on or about August 2, 2015. She complained of having dizziness for the previous week. Respondent recorded that Patient 6 was dizzy and hears liquid in her ears and had been diagnosed with vertigo by a previous provider. She took Claritin nasal spray. Patient 6 stated she has taken meclizine in the past, but it made her drowsy, and that she experienced symptoms each time she got a cold or allergies. Patient 6 provided further history that she had two sisters with vertigo; she had a recent abnormal menstrual period and had an EKG performed a few months ago. Respondent charted a review of systems that was generic and appeared similar to the template notes frequently found in the other patients in which Respondent's treatment is being reviewed. The physical examination did not document neck, ear, or eye exams. Respondent did document bradycardia with a recorded heart rate of 58.

67.    Respondent listed four issues under assessment: (1) encounter for long term use of other medications; (2) unspecified peripheral vertigo; (3) cardiac dysrhythmias; and (4) rule out pregnancy. The plan corresponding to the encounter for long term medications was to perform laboratory tests including vitamin b12, vitamin D, lipid panel, TSH and free T4, basic metabolic panel, CBC test, liver function test, and pregnancy test. For the unspecified vertigo and cardiac arrhythmias, Respondent ordered a holter monitor and promethazine and antihistamine, with fall prevention being monitored. For the potential pregnancy, Respondent ordered the pregnancy test. Patient 6 was to follow up in one week.

68.    Patient 6 was next seen by Respondent on or about August 7, 2015. Respondent diagnosed her hypothyroidism at this visit based on her thyroid tests. The tests showed she had a TSH level of 1.86, and a free T4 value of .71. Patient 6's tests results were not actually diagnostic for hypothyroidism, because the normal test results are generally considered to be .47-4.68 and .7-

20

1   2.19, for TSH and T4, respectively.  Respondent prescribed levothyroxine, 25 milligrams, once
2   per day.  Patient 6 reported that Respondent never touched or examined her during either of the
3   two appointments.

4       69.    Patient 6 was seen by another practitioner two days later complaining of a rapid heart
5   rate and change of mood after taking the new medication, as well as having a feeling of a swollen
6   throat and poor appetite.  The other practitioner stopped the levothyroxine and ordered repeat
7   thyroid function tests.

8       70.    Respondent was grossly negligent in her care and treatment of Patient 6 for her acts,
9   including, but not limited to, the following:

10      A.  Failing to document or perform an examination of the neck, ears and gait, and failure to
11  perform an eye examination of the eyes, including a test for nystagmus;

12      B.  Providing an improper diagnosis and treatment for hypothyroidism; and

13      C.  Failing to provide testing and treatment consistent with the physical exam findings,
14  assessments, and differential diagnoses.

15                      **TWELFTH CAUSE FOR DISCIPLINE**
16                      **(Repeated Acts of Negligence, Patient 6)**

17      71.    Respondent Hanna Queen Rhee, M.D. is subject to disciplinary action under section
18  2234, subsection (c), of the Code, in that she was repeatedly negligent in the care and treatment of
19  Patient 6.

20      72.    Paragraphs 65 through 70, above, are incorporated by reference and repeated as if set
21  forth.

22      73.    Respondent was repeatedly negligent in her care and treatment of Patient 6 for her
23  acts, including, but not limited to, the following:

24      A.  Failing to document or perform an examination of the neck, ears and gait, and failure to
25  perform an eye examination of the eyes, including a test for nystagmus;

26      B.  Providing an improper diagnosis and treatment for hypothyroidism; and

27      C.  Failing to provide testing and treatment consistent with the physical exam findings,
28  assessments, and differential diagnoses.

**THIRTEENTH CAUSE FOR DISCIPLINE**

**(Gross Negligence, Patient 7)**

74.    Respondent Hanna Queen Rhee, M.D. is subject to disciplinary action under section 2234, subsection (b), of the Code, in that she was grossly negligent in the care and treatment of Patient 7. The circumstances are as follows:

75.    Patient 7 was a 63-year old patient when she saw Respondent on or about July 21, 2015 with a complaint of left hand pain. She reported she woke up with pain at 9/10 on her left hand. Respondent recorded that she performed an examination of Patient 7. Respondent wrote under "assessment" that Patient 7 had a rash and other nonspecific skin eruption, personal history of tobacco use, and dehydration. Under "plan," Respondent stated that the rash appeared consistent with scalding or toxic exposure and referred her to the Emergency Room, but also apparently issued a referral to a dermatologist.

76.    Patient 7 was seen that same day at the Emergency Room. The Emergency Room physician's examination recorded that Patient 7 had a rash on the left hand and palm, with induration, tenderness, thickening, inflammation and crusting. He diagnosed her with contact dermatitis and cellulitis of the left hand. He prescribed Triamcinolone 0.5% cream to be applied to the hand three times daily and to return in two days if the symptoms had not improved.

77.    Patient 7 complained that Respondent did not unwrap the bandages on her hand to examine her before referring her to the Emergency Room or to dermatology.

78.    Respondent was grossly negligent in her care and treatment of Patient 7 in that she documented an examination that was not actually performed.

**FOURTEENTH CAUSE FOR DISCIPLINE**

**(Repeated Negligent Acts, Patient 7)**

79.    Respondent Hanna Queen Rhee, M.D. is subject to disciplinary action under section 2234, subsection (c), of the Code, in that she was repeatedly negligent in the care and treatment of Patient 7.

80.    Paragraphs 74 through 78, above, are incorporated by reference and repeated as if set forth.

1    81.    Respondent was repeatedly negligent in her care and treatment of Patient 7 in that she

2    documented an examination that was not actually performed.

3                        **FIFTEENTH CAUSE FOR DISCIPLINE**

4                            **(Gross Negligence, Patient 8)**

5    82.    Respondent Hanna Queen Rhee, M.D. is subject to disciplinary action under section

6    2234, subsection (b), of the Code, in that she was grossly negligent in the care and treatment of

7    Patient 8. The circumstances are as follows:

8    83.    Patient 8 was a 76-year old woman, who saw Respondent on or about July 28, 2015,

9    complaining of burning with urination, although she could not urinate at the time of the visit.

10   Patient 8 also complained of tendonitis of the left shoulder and lower back. Respondent

11   documented a ten-point assessment containing (1) nonspecific abnormal results of kidney

12   function; (2) diabetes mellitus type two; (3) coronary artery disease; (4) malignant neoplasm of

13   the breast; (5) malignant neoplasm of the middle lobe of lung; (6) malignant neoplasm of the

14   lower lobe of lung; (7) unspecified ulcerative colitis (8) long term use of other medications (9)

15   unspecified polyarthropathy; and (10) dysuria. Despite these serious conditions, there was no

16   discussion or treatment provided for the coronary artery disease, long term medication use,

17   polyarthropathy, or any of the malignancies. The ulcerative colitis and kidney functions tests

18   similarly were not discussed and no symptoms or history were listed, even though there was a

19   referral to gastroenterology; similarly the kidney function tests were never documented or

20   discussed but there was a renal referral sent. The diabetes was not discussed or documented,

21   except to indicate that Patient 8 should continue her medication and get yearly eye and foot

22   examinations.

23   84.    Respondent's charting under the assessment and review of systems have no

24   information about any of the assessed conditions, except the dysuria. Respondent did not initially

25   chart a physical examination of Patient 8 in the medical record, which she signed electronically on

26   or about August 3, 2015.

27   85.    On or about August 3, 2015, Patient 8 submitted a written complaint about

28   Respondent stating that Respondent conducted no examination of her after the Medical Assistant

                                    23

1  took her vital signs. After Patient 8's complaint was brought to Respondent's attention,

2  Respondent added an addendum to Patient 8's record, on or about September 2, 2015, which

3  stated, "notified of HER charting error. CORRECTION: gen a n o x3 and cardio RRR no MGR

4  lung unremark sans Rt M.L psych pleasant coop."

5      86.    Respondent was grossly negligent in her care and treatment of Patient 8 in that she

6  documented an examination that was not actually performed.

7                        **SIXTEENTH CAUSE FOR DISCIPLINE**

8                        **(Repeated Negligent Acts, Patient 8)**

9      87.    Respondent Hanna Queen Rhee, M.D. is subject to disciplinary action under section

10  2234, subsection (c), of the Code, in that she was repeatedly negligent in the care and treatment of

11  Patient 8.

12      88.    Paragraphs 82 through 86, above, are incorporated by reference and repeated as if set

13  forth.

14      89.    Respondent was repeatedly negligent in her care and treatment of Patient 8 in that she

15  documented an examination that was not actually performed.

16                       **SEVENTEENTH CAUSE FOR DISCIPLINE**

17                       **(Gross Negligence, Patient 9)**

18      90.    Respondent Hanna Queen Rhee, M.D. is subject to disciplinary action under section

19  2234, subsection (b), of the Code, in that she was grossly negligent in the care and treatment of

20  Patient 9. The circumstances are as follows:

21      91.    Patient 9 was a 54-year old man who had been having syncopal episodes on or about

22  August 7, 2015, which caused his wife to call and make an appointment for him with his primary

23  care physician, Dr. B. His wife reported that as she was bringing Patient 9 to the clinic for the

24  appointment he began having another syncopal episode in the parking lot. Respondent observed

25  this and rushed out to the parking lot. She determined that he was having a cardiac event based

26  on her observations of him, and provided him with nitroglycerin which she administered

27  sublingually.

28  / / /

24

1       92.   Respondent stated that she did not make any chart notes concerning her encounter

2   with Patient 9 because it occurred outside the clinic, in the parking lot. Patient 9's wife reported

3   that Respondent took no history and performed no examination before administering the

4   nitroglycerin to her husband. Respondent was taken to the Emergency Room for treatment. At

5   no time during the event did Patient 9 experience or report having any chest pain.

6       93.   At the Emergency Room, Patient 9 was examined, and was determined to have

7   bacterial pneumonia and dehydration. He was given antibiotics and kept in the hospital overnight

8   for observation. The nurse who recorded the incident with Respondent reported that Respondent

9   told her Patient 9's blood pressure was 74 over 34. Respondent denied this stating that it was not

10  that low. However, nursing notes of Patient 9's treatment in the Emergency Room show that his

11  blood pressure remained extremely low after he was taken to the Emergency Room. It was

12  recorded at 70/40 upon admission. Approximately two and a half hours later, it was recorded to

13  be 87/51. The nurse who reported the event involving Respondent's care of Patient 9 noted that

14  his blood pressure remained in the range of 60's over 30's for approximately 90 minutes after the

15  initial encounter with Respondent. He was observed closely for symptomatic hypotension and

16  given intravenous fluids. Over the next hour, it rose to 80's over 40's, and eventually returned to

17  the range of 90-106 over 50-60 diastolic. She recorded that when Patient 9 reached this level, his

18  skin dried and he was no longer feeling so lightheaded.

19      94.   Respondent was grossly negligent in her care and treatment of Patient 9 for her acts,

20  including, but not limited to, the following:

21      A. Failing to take even a brief history or perform any examination before administering

22  nitroglycerin;

23      B. Administering sublingual nitroglycerin to a patient without chest pain or any indication

24  of a cardiac event; and

25      B. Failing to make any documentation of the incident in the medical record.

26  / / /

27  / / /

28  / / /

25

## EIGHTEENTH CAUSE FOR DISCIPLINE

### (Repeated Negligent Acts, Patient 9)

95.    Respondent Hanna Queen Rhee, M.D. is subject to disciplinary action under section 2234, subsection (c), of the Code, in that she was repeatedly negligent in the care and treatment of Patient 9.

96.    Paragraphs 90 through 94, above, are incorporated by reference and repeated as if set forth.

97.    Respondent was repeatedly negligent in her care and treatment of Patient 9 for her acts, including, but not limited to, the following:

A.   Failing to take even a brief history or perform any examination before administering nitroglycerin;

B.   Administering sublingual nitroglycerin to a patient without chest pain or any indication of a cardiac event; and

B.   Failing to make any documentation of the incident in the medical record.

## NINETEENTH CAUSE FOR DISCIPLINE

### (Failing to Maintain Adequate and Accurate Medical Records)

98.    Respondent has subjected her license to disciplinary action under sections 2234 and 2266 of the Code by failing to maintain adequate and accurate records relating to the provision of services to Patients 1, 2, 3, 4, 5, 6, 7, 8 and 9.

99.    Paragraphs 20 through 97, above are incorporated by reference and repeated as if set forth.

100.   As set forth in paragraphs 20 through 97, Respondent failed to adequately and accurately document the provision of care to Patients 1, 2, 3, 4, 5, 6, 7, 8 and 9, thus subjecting her license to discipline.

///

///

///

(HANNA QUEEN RHEE, M.D.) ACCUSATION NO. 800-2015-018187

1

## TWENTIETH CAUSE FOR DISCIPLINE

2

### (General Unprofessional Conduct)

3      101.  Respondent Hanna Queen Rhee, M.D. is subject to disciplinary action under section

4   2234 in that she has engaged in conduct which breaches the rules or ethical code of the medical

5   profession, or conduct which is unbecoming to a member in good standing of the medical

6   profession, and which demonstrates an unfitness to practice medicine, as alleged in paragraphs 10

7   through 100 above, which are incorporated by reference and realleged as if fully set forth here.

8

### PRAYER

9      WHEREFORE, Complainant requests that a hearing be held on the matters herein alleged,

10   and that following the hearing, the Medical Board of California issue a decision:

11      1.      Revoking or suspending Physician's and Surgeon's Certificate No. A 116932, issued

12   to Hanna Queen Rhee, M.D.;

13      2.      Revoking, suspending or denying approval of Hanna Queen Rhee, M.D.'s authority to

14   supervise physician assistants and advanced practice nurses;

15      3.      Ordering Hanna Queen Rhee, M.D., if placed on probation, to pay the Board the costs

16   of probation monitoring; and

17      4.      Taking such other and further action as deemed necessary and proper.

18

19   DATED:    January 9, 2018

20                                          KIMBERLY KIRCHMEYER
                                            Executive Director
21                                          Medical Board of California
                                            Department of Consumer Affairs
22                                          State of California
                                            *Complainant*

23

24   SA2017304959
     32961937.doc

25

26

27

28

27

EXHIBIT    G

1                          REPORTER'S CERTIFICATE

2                                ---oOo---

3

4    STATE OF CALIFORNIA )

5                        (   ss.

6    COUNTY OF SACRAMENTO)

7         I, JODI TILL, certify that I was the official court

8    reporter, pro tem, for the proceedings named herein, and that

9    as such reporter, I reported in shorthand writing those

10   proceedings;

11        That I thereafter caused my shorthand writing to be

12   reduced to typewriting, and the pages numbered 1 through 224,

13   inclusive, constitute a complete, true, and correct transcript

14   of the proceedings:

15        BEFORE:   ADMINISTRATIVE LAW JUDGE TIFFANY KING

16        Office of Administrative Hearings, Sacramento

17        CAUSE:   re:   HANNA QUEEN RHEE

18        DATE:    May 13, 2019

19        IN WITNESS WHEREOF, I have subscribed this certificate

20   at Sacramento, California, on this 16th day of January, 2019.

21

22

23

24                           _____

25                           JODI TILL, CSR No. 10381

```
1                        REPORTER'S CERTIFICATE

2                             ---oOo---

3

4    STATE OF CALIFORNIA )

5                        (   ss.

6    COUNTY OF SACRAMENTO)

7         I, JODI TILL, certify that I was the official court

8    reporter, pro tem, for the proceedings named herein, and that

9    as such reporter, I reported in shorthand writing those

10   proceedings;

11        That I thereafter caused my shorthand writing to be

12   reduced to typewriting, and the pages numbered 1 through 136,

13   inclusive, constitute a complete, true, and correct transcript

14   of the proceedings:

15        BEFORE:   ADMINISTRATIVE LAW JUDGE TIFFANY KING

16        Office of Administrative Hearings, Sacramento

17        CAUSE:   re:  HANNAH QUEEN RHEE

18        DATE:    May 14, 2019

19        IN WITNESS WHEREOF, I have subscribed this certificate

20   at Sacramento, California, on this 16th day of January, 2019.

21

22

23

24        _____

25                        JODI TILL, CSR No. 10381
```

1                          REPORTER'S CERTIFICATE

2                               ---oOo---

3

4    STATE OF CALIFORNIA )

5                        (   ss.

6    COUNTY OF SACRAMENTO)

7         I, JODI TILL, certify that I was the official court

8    reporter, pro tem, for the proceedings named herein, and that

9    as such reporter, I reported in shorthand writing those

10   proceedings;

11        That I thereafter caused my shorthand writing to be

12   reduced to typewriting, and the pages numbered 1 through 190,

13   inclusive, constitute a complete, true, and correct transcript

14   of the proceedings:

15        BEFORE:  ADMINISTRATIVE LAW JUDGE TIFFANY KING

16        Office of Administrative Hearings, Sacramento

17        CAUSE:   re:  HANNAH QUEEN RHEE

18        DATE:   May 15th, 2019

19        IN WITNESS WHEREOF, I have subscribed this certificate

20   at Sacramento, California, on this 16th day of January, 2019.

21

22

23

24                              _____

25                              JODI TILL, CSR No. 10381

                                                            ---191---

```
 1                    REPORTER'S CERTIFICATE

 2                        ---oOo---

 3

 4   STATE OF CALIFORNIA )

 5                       (   ss.

 6   COUNTY OF SACRAMENTO)

 7        I, JODI TILL, certify that I was the official court

 8   reporter, pro tem, for the proceedings named herein, and that

 9   as such reporter, I reported in shorthand writing those

10   proceedings;

11        That I thereafter caused my shorthand writing to be

12   reduced to typewriting, and the pages numbered 1 through 182,

13   inclusive, constitute a complete, true, and correct transcript

14   of the proceedings:

15        BEFORE:   ADMINISTRATIVE LAW JUDGE TIFFANY KING

16        Office of Administrative Hearings, Sacramento

17        CAUSE:    re:  HANNA RHEE

18        DATE:     May 16, 2019

19        IN WITNESS WHEREOF, I have subscribed this certificate

20   at Sacramento, California, on this 18th day of January, 2019.

21

22

23

24                                    _____

25                             JODI TILL, CSR No. 10381
```

—183—

1                        REPORTER'S CERTIFICATE

2                              ---oOo---

3

4    STATE OF CALIFORNIA )

5                       (   ss.

6    COUNTY OF SACRAMENTO)

7         I, JODI TILL, certify that I was the official court

8    reporter, pro tem, for the proceedings named herein, and that

9    as such reporter, I reported in shorthand writing those

10   proceedings;

11        That I thereafter caused my shorthand writing to be

12   reduced to typewriting, and the pages numbered 1 through 163,

13   inclusive, constitute a complete, true, and correct transcript

14   of the proceedings:

15        BEFORE:   ADMINISTRATIVE LAW JUDGE TIFFANY KING

16        Office of Administrative Hearings, Sacramento

17        CAUSE:    re:   HANNA RHEE

18        DATE:    MAY 17, 2019

19        IN WITNESS WHEREOF, I have subscribed this certificate

20   at Sacramento, California, on this 19 day of January, 2019.

21

22

23

24

25                              JODI TILL, CSR No. 10381

                                                              164